IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————

No. 91-2928

———————————

BILLY JOE WOODS,

Petitioner-Appellant,

versus

GARY L. JOHNSON, Director, Texas
Department of Criminal Justice,
Institutional Division,

Respondent-Appellee.

———————————

Appeal from the United States District Court for the
Southern District of Texas

———————————

February 7, 1996

Before KING, GARWOOD and DUHÉ, Circuit Judges.

GARWOOD, Circuit Judge:

Petitioner-appellant Billy Joe Woods (Woods) appeals the district court's denial of his 28 U.S.C. § 2254 habeas petition challenging his Texas capital murder conviction and sentence to death.

Woods' primary contention is that the punishment stage future dangerousness testimony of prosecution witness Dr. Garcia violated the rule of *Estelle v. Smith*, 101 S.Ct. 1866 (1981), and *Satterwhite v. Texas*, 108 S.Ct. 1792 (1988), and his Fifth, Sixth,

and Fourteenth Amendment rights, because Dr. Garcia had examined Woods for competency prior to trial, but Woods' counsel was not notified of the examination and Woods was not given appropriate *Miranda*-type warnings.[1]  The district court found that Dr. Garcia's challenged testimony was harmless beyond a reasonable doubt, applying the *Chapman v. California*, 87 S.Ct. 824 (1967), standard. Although our analysis in some respects slightly differs from that of the district court, and we apply the more lenient *Brecht v. Abrahamson*, 113 S.Ct. 1710 (1993), harmless error standard rather than the stricter *Chapman* standard, we ultimately agree with the district court that the error in question was harmless under *Brecht*.  The district court likewise rejected Woods' other claims, as do we respecting those he has complained of on appeal.  We hence affirm.

## Facts and Proceedings Below

By indictment filed October 21, 1975, in state court in Harris County, Woods was charged with capital murder committed October 10, 1975, in Houston, Texas, by intentionally killing Mable Ehatt (Ehatt) while in the course of robbing and attempting to rob her. Attorney Thibodeaux had been appointed to represent Woods on October 16, 1975; on October 23, attorney Heacock was also appointed to represent Woods.[2]  On October 22, 1975, the state

---

*Miranda v. Arizona*, 86 S.Ct. 1602 (1966).

Thibodeaux had been licensed in 1970 and his practice consisted primarily of criminal defense work and family law, but he had never defended a capital case.  Heacock was licensed in 1963, had practiced criminal law since then, and had tried several capital cases.  Heacock took primary responsibility for the case.

2

moved for, and the trial court ordered, Woods to undergo a psychiatric examination, with report to be filed in the papers of the case by November 14, 1975.  Although the motion and order were filed in the papers of the case, they were not served on defense counsel.  The court-ordered examinations did not take place until mid-December 1975.  On December 15, 1975, Woods was examined by Dr. Nottingham, a psychiatrist with the Harris County Psychiatric Hospital, and on December 16, 1975, by Dr. Bloom, a psychologist, and by Dr. Garcia, a psychiatrist, each also with the Harris County Psychiatric Hospital.  All three found Woods both sane and competent to stand trial.  The reports of Drs. Nottingham and Bloom were not filed in the papers of the case (or put in evidence at trial), and neither of them testified at trial.  Dr. Garcia's report was filed in the papers of the case on January 15, 1976, but was not put in evidence at trial.[3]  Defense counsel were unaware

_____

Dr. Garcia examined Woods for approximately thirty to forty-five minutes; no tests were performed.  Dr. Garcia's report concludes:

"Psychiatric examination revealed a rather manipulative, caucasian male in no acute physical distress.  He is well oriented as to time, place, and person.  There is no evidence of a thought disorder, no delusional thinking and no delusions and/or hallucinations.  Sensorium is clear.  He has no difficulty handling calculations and there is no evidence of sensorium impairment.  It is the opinion that the subject can appreciate the criminality of his actions and conform his conduct to the requirements of the law.  In addition, the subject has sufficient factual and rational understanding of the proceedings against him, enabling him to understand and to assist in the preparation of a defense.  There is no psychiatric disorder for which he needs to receive psychiatric treatment."

Dr. Nottingham's report similarly concludes:

that the examinations had been ordered or were going to be conducted, and hence were not present at and did not advise Woods respecting any of them.

Meanwhile, on January 12, 1976, defense counsel moved to have

---

"There does not appear to be any disease of the mind or degree of mental defect which would interfere with this individual's ability to understand and appreciate the nature and quality of his behavior and the consequences of his acts. He is cognizant of the difference between right and wrong and able to conform his behavior to the expectations of the law and of society. In addition, he is felt competent to aid his attorney in his own defense and is felt, therefore, by this examiner to be of SOUND MIND."

The report of the psychologist, Dr. Bloom, reflects that Woods was interviewed and administered some five tests which reflected, *inter alia*, full IQ of 80, verbal 81, performance 81, "functioning in the dull normal range of intelligence" and having "the ability to learn and to reason." There was "no evidence of organic brain dysfunction." Although some test responses were described as "suggesting immaturity and inadequate personality development" and "insecurity," there "were no bizarre or otherwise pathognomonic responses which would indicate the presence of a psychotic thought disturbance." The report concluded:

"The results of the examination indicate that Mr. Woods is aware of the nature of the charges and proceedings against him, and has the intellectual capacity to understand these in a rational way. He also has the capacity to understand the difference between right and wrong; to understand the nature, quality, and possible consequences of criminal behavior; and to conform his behavior to the expectations of society and the law if he so chooses. He also has the ability to consult with his attorney in a rational manner in the preparation of his defense. For these reasons, Mr. Woods is considered competent to stand trial."

The reports of Dr. Garcia and Dr. Nottingham reflect that Woods was born December 20, 1946, was removed from his family home at the age of six, and at age eight was, with one of his brothers, placed with the Woods family, who adopted him. He left school in the tenth grade, married at age twenty-two, and divorced a year later. He was convicted of attempted aggravated rape in Louisiana and was released from the Louisiana penitentiary in 1975.

4

Woods examined for competency by psychiatrist Dr. Byrd, who had a reputation of being pro-defense. On January 22, 1976, the trial court granted the motion and ordered that the examination by Dr. Byrd take place January 25. Dr. Byrd examined Woods prior to trial—though just when is not clear—and the results of his examination were so adverse to the defense that defense counsel asked him to refrain from writing or filing a report with the court. There is no indication that Dr. Byrd ever wrote a report, and he did not testify. He did advise defense counsel that he found Woods competent to stand trial and sane at the time of the offense, he characterized Woods as anti-social and mean, and informed defense counsel that counsel would not want him, Dr. Byrd, to testify.

Trial on the merits did not commence until July 1976. On July 6, just before the commencement of *voir dire*, defense counsel filed a motion requesting that the court instruct the district attorney in various respects including, in the motion's paragraph III, "not [to] allude to or introduce results of any scientific tests made by the State of Texas, specifically, *psychiatric tests*, fingernail scrapings, pubic hairs or blood samples taken from the defendant" (emphasis added), on the ground (stated in the motion's paragraph IV) that if allowed those matters would violate defendant's Fifth Amendment rights and "defendant was without counsel at the time of the scientific tests." The court's notation at the foot of the motion appears to indicate that it was granted "as to paragraph III." However, the transcript of the hearing on this and other

5

defense motions indicates that the motion (which counsel orally described at the hearing as relating to "a blood sample, hair, maybe fingernail scrapings") as there stated was overruled, though apparently without prejudice to being presented later. There is no indication that the motion was ever presented later.[4]

At the guilt/innocence stage of trial, no issue was raised and no evidence was presented concerning Woods' sanity or competency. The state's unrebutted evidence at the guilt/innocence stage is generally summarized in the Texas Court of Criminal Appeals' opinion on Woods' direct appeal:

> ". . . in the middle of the night appellant climbed up some poles and lattice work to the balcony of the second story apartment of a 63 year old woman [the victim, Mable Ehatt] who was afflicted with cancer and could move about only with the aid of a walker. Appellant forced the door open from the balcony into the apartment and once inside robbed the occupant and beat and strangled her to death. He also apparently attempted to perform some sort of sexual act with her because she was found to be nude from the waist down, several hairs from her head were found jammed in the zipper of appellant's fly which was open when he was arrested at the scene, and a considerable amount of feces and blood from the deceased were found on the front of appellant's trousers, shorts, shirt and shoes." *Woods v. State*, 569 S.W.2d 901, 902 (Tex. Crim. App. 1978), *cert. denied*, 101 S.Ct. 3145 (1981).

According to the police officers' testimony, when they entered the apartment (where the deceased had lived alone) it was "in complete disarray," the victim's walker was turned over on the floor, her purse had been emptied on the floor, and large quantities of blood and human defecation were observed on the floor

---

During the course of trial defense counsel did object to evidence of some of the items mentioned in the motion—e.g., pubic hairs.

6

of the living room and dining room.  The deceased's still warm body was lying in the kitchen "in a good bit of blood and human defecation," with her head in the entryway between the dining room and kitchen.  She was naked from the waist down.  There was blood "from her mouth."  Her face and eyes were swollen and discolored, "severe bruises" were visible on her head and back, and there was "an extreme amount of blood in the apartment, on her and around her."  Bits of body tissue were observed in the blood on the floor.  The victim's sister testified that when her body was seen later one of Ehatt's eyes "looked like half of a tennis ball."  The medical examiner testified that "the cause of death was a fractured hyoid bone and fractured skull, blunt trauma to neck and head and manual strangulation."[5]  The hyoid bone was fractured on both sides, which the examiner testified "indicates constriction type of trauma; that's squeezing of the neck and resistance on the part of the victim."[6]  The deceased's fractured skull could have been caused by someone of Woods' size striking her head with his fists (or kicking her head with his feet or hitting it with an object such as a baseball bat).

The defendant was found by the police officers alone (except for the deceased) in the apartment; the zipper on his fly was open, and hairs from the deceased's head were caught in it; his

---

The examiner, who examined the deceased at 7:30 a.m. October 10, 1975, testified that her condition was consistent with a time of death shortly before the officers entered the apartment.

The examiner explained that "the hyoid bone is the U-shaped bone that sits high up in the neck.  It's comparable to the wish bone in the chicken."

7

undershorts had blood and hair on them; there was blood and defecation, still fresh, on his shoes.  The officers at that time observed bruises and abrasions on the defendant's knuckles, abrasions on the palm of his hand, numerous scratches on his back below the shoulders, and a long scratch on the back of his right leg.  The defendant had the deceased's bracelet on his left wrist and her hair brush and prescription medicine, and a woman's electric razor, in his pants pocket.

There was no defense evidence.[7]  The jury found Woods guilty

Nor has there ever been any showing or even allegation that Woods was not guilty of the offense.

A psychologist who examined Woods in July 1988 at the request of his habeas counsel submitted a report opining that

> "Mr. Woods' behavior in these offenses [the instant offense and a 1969 attempted rape] was overdetermined and therefore, should be regarded more as a manifestation of psychological or emotional imperatives than as merely an extension of criminal intent.  Viewed in terms of these considerations, Mr. Woods' conduct is consistent with known diagnoses of temporary states of mental illness which, among other things, raises the rather strong possibility that he was diagnosably insane at the time of the offense."

This report does not suggest that Woods was psychotic.  Nor does it state that he did not know his conduct was wrong, which is (and was) the sole Texas test for insanity.  Tex. Penal Code § 8:01(a) ("as a result of severe mental disease or defect, did not know that his conduct was wrong").

Attorney Heacock stated in an affidavit (filed by the state in response to Woods' state habeas) that Woods

> "admitted having committed the burglary, but denied killing Mable Ehatt.  He contended that he had met a friend at a near-by bar and that, together, they walked to Ms. Ehatt's house and broke in.  It was this 'friend,' according to Billy Joe, who killed Ms. Ehatt.  When pressed for details, however, Billy Joe could give us none.  He did not remember the name or the location of the bar where he had met his friend, nor could he give us any information concerning his friend other than his

8

as charged.

Thereafter, just before the punishment phase of trial commenced, defense counsel, out of the presence of the jury, unsuccessfully objected to the anticipated calling of Dr. Garcia as a punishment stage witness for the state, on the ground that Dr. Garcia's examination of Woods was performed "without the consent or permission of the defense attorneys" and his testimony would constitute "an abridgement of the Fifth Amendment rights."[8]

At the punishment stage, the prosecution first put in evidence that in April 1970 Woods was convicted, in Louisiana state court, on his plea of guilty, of attempted aggravated rape, committed December 21, 1969, in New Orleans, and was sentenced to fifteen

first name."

The objection in full was:

"This will be pertaining to the testimony I believe of a Dr. Garcia, who would be a psychiatrist for the Harris County forensic psychiatric unit. The basis for my objection would be that the examination performed by Dr. Garcia upon the defendant was without the consent or permission of the defense attorneys involved in the case, that the fact that the doctor examined the defendant and elicited from him certain information, even though the Code of Criminal Procedure does not permit the doctor to testify to the discussions he had with the defendant, it does allow the doctor to testify as to the end result of his examination, to wit, his feeling or opinion of the defendant's competency; and also to the proposition of question number two, that is, that there is a probability that the defendant will commit further acts of violence and continue to be a further threat to society. We feel that this indirectly not only shall be used against him as an abridgement of the Fifth Amendment rights, but also will be used for the jury to decide question number two so that his life may be taken. For these reasons, we object to any testimony from Dr. Garcia or forensic psychiatrists or psychologists based on that reason, if it please the court."

years in the penitentiary.  The state then called Dr. Garcia, who,

after identifying himself as a psychiatrist, testified as follows:

"Q.  Did you have an occasion to examine the defendant in this case, Billy Joe Woods?
A.  I have.
Q.  Did you have an occasion to determine whether or not or what type of mental label, if you will, you put as a psychiatrist on the personality of the defendant?
A.  Well, it's customary that we address to the questions asked by the court and they are generally questions of competency.  I did not include a psychiatric label in my report to the court, since I was asked to address myself to the issues of sanity and competency.
Q.  Did you determine whether or not the man was competent, insane?
A.  I did.
Q.  Was he competent?
A.  In my opinion, he was.
Q.  Now, if you will, let me state a hypothetical situation to you and have you give your opinion as to the affect [sic] on this defendant, if that hypothetical situation applied to the defendant.  Assume that a person in 1970 was convicted of the offense of attempted rape, felony, sentenced to the penitentiary and then in 1975 at three in the morning, climbed up a porch, up onto a porch on the second floor balcony, kicked in a lady's door forcibly, went inside and completely ransacked, turned everything in the apartment upside down, knocked things over, took the lady's bracelet, pill bottle, carried a television downstairs from her apartment, beat her about the head in such a way that her facial features were obscure to the point of almost not being able to identify the way she looked, tremendous beating, in other words, fractured skull, strangulation, two fractures in the hyoid bone, and then in some manner caused his pubic hair to come in contact with her head while his pants were down and at least he dressed in no more than his under wear, had his pubic hair touching the lady's head, and the lady was sixty-two years old, invalid, who had to get around on a walker in order to move about, and that he killed this lady by beating her and strangling her and was then caught in the room with her, if *that hypothetical situation* applied to this defendant, *knowing his mental background as you do*, can you tell us whether it's more likely than not that this defendant would commit criminal acts of violence that would constitute a continuing threat to society?"  (Emphasis added).

At this point defense counsel objected, the objection was

10

overruled,[9] and the direct examination continued as follows:

"Q (by Mr. Graham)  Can you answer the question:
A.  Okay.  In relation to the hypothetical question you presented, you described what sounds as a very aggressive act.
Q.  Very aggressive act?
A.  *Aggressive and violent act in association with a person that has committed similar violent acts in the past.*  In your final question, would you repeat the final part of the question?  Would he be more likely--
Q.  Yes, sir.  *Would he be more likely to commit continued acts of violence that would constitute a continuing threat to society?*
A.  *My answer to that would be yes.*
Q.  And what is the best method of determining what will happen in the future or what someone will do in the future?
A.  *Well, we don't really have any methods that's very accurate.*  In fact, statistical studies on prediction have shown that the *prediction of the members of the judicial system is almost, if not more accurate, than the people in the behavioral sciences.*  That is, we in the psychiatric profession and judges come pretty close to the same level of accuracy.
Q.  Well, in your particular medical field, do you use the past to determine the best you can what will happen or what a person will do in the future?
A.  We use much attitudinal assessments of a person's personality development; how they interact in society and how they may project of possible behavior, but *there are many variables that usually are unforeseen that we cannot even attempt to predict.*
Q.  Is what someone did in the past the best method you have of determining--I know you are saying you can't say to an absolute certainty what someone is going to do in the future.
A.  *The things that have occurred in the past are*

---

Defense counsel stated:

"MR. HEACOCK:  If it please the court, I have some objections to the question.  One, it's not a hypothetical question.  Second, there has been no predicate laid at this point for a doctor to answer such a question.  I feel it's a vain attempt by the state to get a doctor to answer a question that due to medical probability he cannot answer and I would object to it very strenuously, if it please the court.
    THE COURT:  Overruled.
    MR. HEACOCK:  Note our exception."

*associated with the person at the time of examination, together, is the best tool we have at the present time.*
*Q. That includes considering what a person did in the past?*
*A. That is correct.*
*Q. Is that what helped you to come to your answer a minute ago about a hypothetical situation?*
*A. True."* (Emphasis added).

That concluded the direct examination. On cross-examination,

Dr. Garcia testified as follows:

"Q. Dr., how long did you spend with Mr. Woods when you examined him?
A. I imagine between thirty to forty-five minutes, which is pretty standard time for my examination.
Q. Standard time?
A. That is correct.
Q. *You examined him one time?*
A. *True.*
Q. *With the purpose in mind to determine his competency?*
A. *True.*
Q. You submitted certain standard tests to him?
A. I took a psychiatric examination.
Q. Was it just all verbal?
A. Psychiatric examination includes subjective assessments of the history given by the examinee, as well as objective assessment given by the examiner. I did not administer any type of psychological tests. I'm not a psychologist.
Q. And you came to your professional opinion after a thirty to forty-five minute session, approximately?
A. True.
Q. When you started initiating your conversation with him did you say anything about the results of your examination, your opinion would be used to seek the death penalty on him?
A. No, I did not. I did tell him that the content of the interview would be reported to the court; furthermore, he was told that he had the right to decline to answer questions during the examination. But I did not go to the other extreme, because *I was not aware that that would be the way it was at the time of the examination.*
Q. There was no attorney or anyone else, just he and you when the interview took place?
A. That is correct.
Q. Now, you stated there are many variables. Are these behavior type variables? What was the term?
A. Well, I did not so specify. *There are many things that can enter in a person's functioning that could alter*

12

*the course of their adjustment to either life or any kind
of situation*, whether they are environmental things or
facts occurring in their environment or things occurring
internally, changes in attitude and so on, *but I don't
have any way of knowing what those might be.*
Q.  Each living person that has a degree of--I hate to
use rationalist, but competency, a competent person
always has the chance or the possibility of changing
inside them, something that would change their behavioral
pattern?
A.   That's too broad a statement.   I cannot say that
every person at some point does have that opportunity?
There's some people that have a personality structure of
such nature that may not likely change, but again--
Q.  By the same token, *you can't point at somebody and
say 'That man will never change', can you*?
A.  *There's some people I could.*
Q.  *Did you, for example, in this case*?
A.  *Well, I was not asked that question.  The question
was would a person in the hypothetical be more likely to
commit acts of violence and my answer to that was yes.
But if I would be asked to give an opinion with a degree
of accuracy greater than that, I cannot answer because I
can't predict to that extent.*"   (Emphasis added).

That concluded Dr. Garcia's testimony, and no other evidence
was presented at the punishment stage of the proceedings.
Following argument of counsel, the court charged the jury,
submitting to it the deliberateness and future dangerousness
special issues called for by Tex. Code Crim. Proc. art. 37.071(b).[10]
The jury returned an affirmative answer to each of the special

Article 37.071(b) then provided:

    "(b)   On conclusion of the presentation of the
evidence, the court shall submit the following issues to
the jury:

    (1)   whether the conduct of the defendant that
caused the death of the deceased was committed
deliberately and with the reasonable expectation that the
death of the deceased or another would result;

    (2)   whether there is a probability that the
defendant would commit criminal acts of violence that
would constitute a continuing threat to society; . . . ."

13

issues, and the court accordingly sentenced Woods to death.  The conviction and sentence were affirmed on direct appeal, in which Woods was represented by new counsel (Thornell), *Woods v. State*, 569 S.W.2d 901 (Tex. Crim. App. 1978), and the Supreme Court denied certiorari June 29, 1981.  *Woods v. Texas*, 101 S.Ct. 3145 (1981).

Woods, represented by the same counsel who represented him on direct appeal, in October 1981 sought habeas relief in the Texas courts, contending that under *Estelle v. Smith*, 101 S.Ct. 1866 (1981), the introduction of Dr. Garcia's testimony violated his Fifth, Sixth, and Fourteenth Amendment rights because Woods was not given proper warnings regarding his privilege against self incrimination in respect to Dr. Garcia's examination and because, his counsel not having been notified of the examination or that it would encompass future dangerousness, there was no opportunity to consult with counsel in regard thereto.  The Court of Criminal Appeals denied relief.  *Ex parte Woods*, 745 S.W.2d 21 (Tex. Crim. App. 1988).  It held that *Estelle v. Smith* "applied retroactively as to both Fifth and Sixth Amendment violations" and that Woods had adequately preserved his complaints regarding Dr. Garcia's testimony.  *Ex parte Woods* at 25.  It distinguished *Estelle v. Smith* on the basis that there the psychiatrist Dr. Grigson's testimony was that, based upon his examination of the defendant, he considered the defendant a sociopath who would commit violent acts in the future, while:  "[i]n the instant case Dr. Garcia did not so testify.  He was asked a hypothetical question.  His response was based upon the hypothetical facts he was asked to assume.

14

Hypothetical testimony alone by a qualified psychiatrist, even one who has not examined the individual, is admissible and in such cases *Estelle v. Smith*, supra, is not ordinarily applicable." *Ex parte Woods* at 25 (footnote omitted). On its analysis of Dr. Garcia's testimony, the Court of Criminal Appeals concluded:

> "We cannot say, in the context of the entire interrogation of Dr. Garcia including the cross-examination, that the answers to the hypothetical question were influenced by and derived from the court-ordered pretrial psychiatric examination. Dr. Garcia indicated in his responses he was basing his answers upon the hypothetical, not upon the interview with applicant or the applicant's answers to any questions." *Id*. at 26.

Thereafter Woods, represented by still another set of counsel (who have continued to represent him), in April 1988 filed another state habeas application that was subsequently amended and supplemented. In October 1988 the state trial court entered findings and conclusions and recommended that habeas relief be denied.[11] The Court of Criminal Appeals on July 7, 1989, denied

These findings and conclusions included the following:

> "A jury could not reasonably construe Dr. Garcia's testimony, including the cross-examination, as being influenced by or derived from the court-ordered pretrial psychiatric examination of Applicant.
>
> . . . .
>
> The prosecutor's use of the phrase 'knowing his [the defendant's] mental background as you do' (R. 1366, L. 16), although arguably improper in the context of the hypothetical question, was harmless in light of Dr. Garcia's response and subsequent testimony which showed that his opinion on future dangerousness was limited to the hypothetical facts assumed and not derived or influenced by his pretrial examination of Applicant for sanity and competency.
>
> Applicant is procedurally barred from complaining about

15

relief "on the basis of the findings and conclusions entered by the trial court." In September 1990, Woods, represented by the same counsel, filed still another state habeas application. The state trial court entered findings and conclusions and recommended denial of relief. The Court of Criminal Appeals again denied relief on the basis of the trial court's findings.

Woods, represented by the same counsel, then commenced the instant habeas proceeding under section 2254. The district court ultimately denied relief, and Woods brings this appeal.[12]

## Discussion

### I. Dr. Garcia's Testimony

The district court followed *Satterwhite v. Texas*, 108 S.Ct. 1792 (1988), and applied the harmless error standard of *Chapman v. California*, 87 S.Ct. 824 (1967). It found "beyond a reasonable doubt that Dr. Garcia's expert testimony on the issue of Petitioner's future dangerousness did not influence the sentencing jury."

*Satterwhite* was a *direct* appeal case involving an error—unlike

the prosecutor's remarks in closing argument (R. 1382, L. 3-16) as Applicant lodged no objection to said remarks and in the context of the entire argument, the comments: (1) were not so prejudicial that no instruction could cure the harm; and (2) were not of such character that the jury would naturally and necessarily construe Dr. Garcia's opinion to be derived from his limited examination of Applicant for sanity and competency."

The district court denied a certificate of probable cause. We carried the request for certificate of probable cause with the case, directed the parties to fully brief the appeal as on the merits, and heard full oral argument. We now grant the certificate of probable cause and rule on the merits of the appeal. *Cf. Anderson v. Collins*, 18 F.3d 1208, 1223 n.18 (5th Cir. 1994).

16

certain other constitutional errors that "pervade the entire proceeding," *Holloway v. Arkansas*, 98 S.Ct. 1173 (1978), being one of the examples given—which the Court ruled would *not* require reversal if it were harmless under the *Chapman* standard. *Satterwhite* at 1797-98. To find such a constitutional error harmless under the *Chapman* standard, the court would have to conclude "beyond a reasonable doubt" that it "did not contribute to the verdict." *Satterwhite* at 1797. After the district court's decision here, the Supreme Court held in *Brecht v. Abrahamson*, 113 S.Ct. 1710 (1993), that constitutional errors of the kind not requiring automatic reversal would be evaluated under *Chapman*'s harmless "beyond a reasonable doubt" standard *only* on direct appeal, and that in habeas cases the appropriate standard was the "less onerous harmless-error standard" of *Kotteakos v. United States*, 66 S.Ct. 1239 (1946), applicable to direct appeal review of nonconstitutional claims. *Brecht*, 113 S.Ct. at 1714. Brecht concluded that "[t]he imbalance of the costs and benefits of applying the *Chapman* harmless error standard on collateral review counsels in favor of applying a less onerous standard on habeas review of constitutional error." *Brecht* at 1721-22. The *Kotteakos* standard requires that the error have resulted in "'actual prejudice,'" in other words "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht* at 1722.

The *Brecht* court also stated that

> "granting habeas relief merely because there is a 'reasonable possibility' that trial error contributed to the verdict, see *Chapman v. California*, 386 U.S. at 24, 87 S.Ct. at 828 (quoting *Fahy v. Connecticut*, 375 U.S.

17

85, 86, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)), is at odds with the historic meaning of habeas corpus—to afford relief to those whom society has 'grievously wronged.'" *Brecht* at 1721.

Thus, under *Brecht*, a constitutional trial error is not so harmful as to entitle a defendant to habeas relief unless there is *more* than a mere reasonable possibility that it contributed to the verdict. It must have had a *substantial* effect or influence in determining the verdict. We recognize, however, that if our minds are "in virtual equipoise as to the harmlessness," under the *Brecht* standard, of the error, then we must conclude that it was harmful. *O'Neal v. McAninch*, 115 S.Ct. 992, 994 (1995). Moreover, the *Brecht* standard does not require in order for the error to be held harmful that there be a "reasonable probability" that absent the error the result would have been different. *Kyles v. Whitley*, 115 S.Ct. 1555, 1566-67 (1995).

In holding Dr. Garcia's testimony was harmless beyond a reasonable doubt, the district court properly characterized the doctor's testimony as "equivocating and weak." When asked by the prosecutor what was "the best method" for predicting "what someone will do in the future," Dr. Garcia responded "we don't have any methods that's very accurate." He further stated that "prediction of the members of the judicial system is almost, if not more accurate, than the people in the behavioral sciences." Later in his direct testimony he stated, in answering a question concerning determination of "what a person will do in the future," that "there are many variables that usually are unforeseen that we cannot even attempt to predict." While Dr. Garcia did testify that a person

18

who commits a very aggressive and violent act and has previously committed a similar violent act, as described in the hypothetical, would be "more likely" to commit further violence, he never expressly articulated what he meant by "more likely." However, in light of Dr. Garcia's testimony as a whole, especially his testimony that the best predictive methods were not "very accurate," the most reasonable inference is that Dr. Garcia was simply saying that such a person was "more likely" *than a person who had not committed such violent acts* to act violently in the future. But beyond that common sense comparative observation—equally within the ken of the juror or the psychiatrist, as Dr. Garcia's testimony suggested—Dr. Garcia was unable to say "because I can't predict to that extent." We agree with the district court that "[a] dispassionate reading of the trial transcript reveals Dr. Garcia was of little help to the prosecution" and "[h]is testimony did not buttress the state's case."

Dr. Garcia's testimony is to be contrasted to that challenged in *Estelle v. Smith* and in *Satterwhite*. In the former case, the Supreme Court, without expressly addressing the matter of harmless error (which the state apparently never even raised), noted that Dr. Grigson had testified

> "(a) that Smith 'is a very severe sociopath'; (b) that 'he will continue his previous behavior'; (c) that his sociopathic condition will 'only get worse'; (d) that he has no 'regard for another human being's property or for their life, regardless of who it may be'; (e) that '[t]here is no treatment, no medicine . . . that in any way at all modifies or changes this behavior'; (f) that he 'is going to go ahead and commit other similar or same

19

criminal acts if given the opportunity to do so'; and (g) that he 'has no remorse or sorrow for what he has done.'" *Estelle v. Smith*, 101 S.Ct. at 1871.[13]

*Satterwhite* was a direct appeal, and the Supreme Court applied the *Chapman* harmless "beyond a reasonable doubt" standard. The Court found "it impossible to say beyond a reasonable doubt that Dr. Grigson's expert testimony on the issue of Satterwhite's future dangerousness did not influence the sentencing jury." *Satterwhite*, 108 S.Ct. at 1799. The Supreme Court described Dr. Grigson's testimony there as "powerful and unequivocal," having given the following summary of it:

> "He stated *unequivocally* that, in his expert opinion, Satterwhite '*will* present a continuing threat to society by continuing acts of violence.' He explained that Satterwhite has 'a lack of conscience' and is 'as severe a sociopath as you can be.' To illustrate his point, he testified that on a scale of 1 to 10—where 'ones' are mild sociopaths and '*tens*' are individuals with complete disregard for human life—Satterwhite is a 'ten plus.' Dr. Grigson concluded his testimony on direct examination with perhaps his most devastating opinion of all: he told the jury that *Satterwhite was beyond the reach of psychiatric rehabilitation.*" *Id*. at 1799 (emphasis added).

The contrast to Dr. Garcia's testimony here could hardly be more

---

In *Estelle v. Smith*, the Supreme Court affirmed the decision of this Court, *Smith v. Estelle*, 602 F.2d 694 (5th Cir. 1979), which in turn affirmed the district court's grant of habeas relief. We characterized Dr. Grigson's testimony as "extremely damaging to the defendant" and noted the parts of the doctor's testimony later mentioned by the Supreme Court and also other parts, such as "it is not a stage he is going through. It's only something he will continue," that the doctor said he was "absolutely . . . convinced" Smith was "on the far end of the sociopathic scale," and that the doctor said "certainly" Smith would commit similar acts in the future. *Id*., 602 F.2d at 697-698.

complete.[14]

It is also important to note that the constitutional violations here are the examination of Woods by Dr. Garcia without adequate *Miranda* warnings and without an opportunity to first consult with counsel, contrary to the Fifth and Sixth Amendments as made applicable to the states through the Fourteenth Amendment. *Estelle v. Smith*. Yet, as the district court observed, "[b]asically, Dr. Garcia did not testify about the content of his conversation with Petitioner or Petitioner's behavior during the exam." We also agree with the assessment of the state habeas court that "[a] jury could not reasonably construe Dr. Garcia's testimony, including the cross-examination, as being influenced by or derived from the court-ordered pretrial psychiatric examination of Applicant" (see note 11, *supra*). Moreover, the Texas Court of

_____

We recognize that in *Satterwhite* the state had, in addition to Dr. Grigson, other witnesses as to future dangerousness, including a psychologist. However, the principal focus in *Satterwhite* was on the nature and content of Dr. Grigson's testimony, just as our focus is principally on the nature and content of Dr. Garcia's testimony. The question, after all, is the effect of that testimony, and it is therefore the testimony itself which must initially be looked to. We are also aware that in *Satterwhite* the Court observed that Dr. Grigson's "testimony stands out . . . because of his qualifications as a medical doctor specializing in psychiatry" and that "Dr. Grigson was the only psychiatrist to testify," *id*. at 1799, and that in this case Dr. Garcia was likewise the only psychiatrist to testify. Nevertheless, Dr. Garcia affirmatively indicated that a psychiatrist's insight in this respect was no more accurate than that of "members of the judicial system," so, unlike the situation in *Satterwhite*, professional credentials and speciality were not of significant importance here. Further, the facts and circumstances of this offense were aggravated, savage, and brutal to a significantly greater extent than in *Satterwhite*. Finally, of course, and of crucial importance, *Satterwhite* applied the more onerous "harmless beyond a reasonable doubt" *Chapman* standard, while we must apply the less onerous standard of *Brecht*.

21

Criminal Appeals similarly so concluded. *Ex parte Woods*, 745 S.W.2d at 26. We, of course, recognize that the prosecutor, by first asking Dr. Garcia whether he had examined Woods, then asking what sort of a psychiatric label he had ascribed to Woods, and finally inserting the "knowing his mental background as you do" language into his lengthy hypothetical question just *after* describing the objective facts of "that hypothetical situation," was attempting to have Dr. Garcia leave the impression with the jury that his examination of Woods likely caused him to believe Woods would commit future acts of violence. Certainly that attempt was contrary to *Estelle v. Smith*, because Woods received neither adequate *Miranda* warnings nor the opportunity to consult with counsel respecting the examination. But, the attempt was not successful. Dr. Garcia plainly indicated that his examination addressed only sanity and competency, and the only testimony he gave as to his findings on examination was that in his opinion Woods was competent. Dr. Garcia refused the prosecutor's invitation to put a psychiatric label on Woods or his personality, and he further indicated on cross-examination that he made no determination about whether Woods was an individual who could not change. While the hypothetical question did include the "knowing his mental background as you do" language, Dr. Garcia did *not* answer the question as asked. Instead, he stated "[i]n relation to the hypothetical question you presented, you described what sounds like a very aggressive act," an "aggressive and violent act in association with a person that has committed similar violent acts

22

in the past."  Dr. Garcia then asked that "the final part of the question" be repeated.  The prosecutor did so, but *without* any reference to "knowing his background as you do," instead merely asking "[w]ould he be more likely to commit continued acts of violence that would constitute a continuing threat to society?"  Dr. Garcia replied, "[m]y answer to that would be yes."  The plain inference is that Dr. Garcia was speaking simply to what the original question had labeled "that hypothetical situation" (*before* mentioning "knowing his background as you do"), namely a person who had been convicted of attempted rape in 1970 and sent to the penitentiary, and, after release, committed the instant brutal offense in 1975.  That also is the reasonable reading of Dr. Garcia's reference to "a person in the hypothetical" in his answer to the final question on cross-examination.

Woods points out that Dr. Garcia responded to the prosecutor's question "is what someone did in the past the best method" by stating "[t]he things that have occurred in the past are associated with the person at the time of examination."  However, Dr. Garcia, whose testimony reflected he had not examined Woods concerning future dangerousness, never stated that he made any such "association" in respect to Woods.  Indeed, he never testified that *Woods* would be dangerous in the future.  Moreover, immediately after Dr. Garcia's referenced answer came the following questions and answers:

"Q.  That includes considering what a person did in the past?
A.  That is correct.
Q.  Is that what helped you to come to your answer a

23

minute ago about a hypothetical situation?
A.    True."

The "that" in the prosecutor's above-quoted final question is most reasonably understood as referring to the "what a person did in the past" language from the immediately preceding question.[15]

The message of Dr. Garcia's opinion testimony as to future dangerousness—as equivocal, uncertain, and confessedly not "very accurate" as it was—is that it derived from and related to the acts of violence detailed in the prosecutor's question (and there referred to as the "hypothetical situation"), not from Dr. Garcia's examination of Woods.[16]

---

This is consistent with the prosecutor's statement in his sentencing argument that "[t]he psychiatrist testified the past conduct is one of the best ways to determine what somebody is going to do in the future."

Woods filed in the court below a September 25, 1990, affidavit by Dr. Garcia in which he initially recounts his December 1975 examination of Woods, saying he "understood the examination was for sanity and competency purposes only." Woods relies on the following statements in the affidavit:

"[T]he prosecutor asked me a long hypothetical question relating to the future dangerousness of Mr. Woods but inserted in that question a direction to me to consider Mr. Woods' mental background. I did as the prosecutor asked and answered that question based not only on the facts stated to me in the prosecutor's hypothetical but also Mr. Woods' background as it was known to me from my examination. Therefore, my answer to the question was in part influenced by and derived from my examination of Mr. Woods in December of 1985 [sic]."

The state moved below to strike this affidavit on the grounds, *inter alia*, that "[n]either the affidavit nor the substance of its content were presented to the state courts" and Woods "offers absolutely no reason why he could not have procured the affidavit or the testimony of Dr. Garcia at an earlier time," had been "inexcusably neglectful in failing to present this evidence to the state courts," and "could easily have sought out Dr. Garcia long before this." Woods replied but offered no explanation whatever

24

Woods relies on *White v. Estelle*, 720 F.2d 415 (5th Cir. 1983), as condemning under *Smith* future dangerousness opinion testimony in response to hypothetical questions "thinly veiled and patterning exactly" the defendant's "prior criminal activity" and "closely tailored to fit" the defendant "himself." *Id.* at 417. However, there we observed that "[t]he questions had been preceded by the testimony of each of the witnesses that *they had examined* [the defendant] *White and had concluded that he possessed an anti-social personality*." *Id.* at 417 (emphasis added). Here, by contrast, Dr. Garcia, although he stated he had examined Woods, nevertheless expressly refused to put a psychiatric label on his personality. Further, in *White*, in affirming the district court's grant of habeas relief, we went on to state:

> "*Dr. Brown's testimony* in this regard *was* admittedly *based upon his court-ordered examination of White*. Dr. Brown testified that White had an anti-social 'hedonistic' personality (tied in by subsequent questioning of the witness as being a 'sociopath'), a type of personality in which treatment was both

for the failure to earlier procure the affidavit or present it to the state courts. Indeed, he has not yet done so, though the state has complained on this appeal of the district court's denial of its motion to strike. The district court denied the motion, saying it "finds no evidence" that Woods or his counsel "committed inexcusable neglect." However, the court made no reference to any facts tending to excuse or explain the belatedness of the affidavit or the failure to present it or its content to the state courts. The district court stated "[t]he inexcusable neglect standard has been equated to that of a 'deliberate bypass' standard," giving a "see also" citation to *Townsend v. Sain*, 83 S.Ct. 745 (1963). However, under *Keeney v. Tamayo-Reyes*, 112 S.Ct. 1715 (1992), handed down after the district court's decision, the "deliberate bypass" standard has been rejected for these purposes in favor of the ordinary "cause and prejudice" standard. We hold that as a matter of law no "cause" (or anything even remotely approaching cause) has been shown, and that the district court erred in not striking Dr. Garcia's affidavit.

25

unresponsive and with poor results . . . oriented more or less toward the moment and considered little in terms of the future consequences of his acts, and that a sociopath was characterized by an absence of remorse or guilt for past crimes and an inability to profit from past experience. The questioning was obviously directed towards White's propensity for future violence." *Id.* at 418 (emphasis added).

Again, nothing of the sort is present in Dr. Garcia's testimony. Finally, in *White* we declined to reverse the grant of habeas relief on the basis of the state's contention that the admission of the testimony "was harmless beyond a reasonable doubt," stating "[w]e cannot conclude that evidence admitted on a crucial issue in . . . a capital case, in violation of White's constitutional rights, constituted harmless error beyond a reasonable doubt. See *Holloway v. Arkansas*, 435 U.S. 475, 489-90, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 (1978)." The cited passage of *Holloway* announces a rule of automatic reversal.[17] After we handed down *White*, the Supreme Court in *Satterwhite* expressly rejected the *Holloway* automatic reversal rule for *Smith* errors, and opted instead for the *Chapman* harmless beyond a reasonable doubt standard. *Satterwhite*, 108 S.Ct. at 1798. Later, in *Brecht*, the still more lenient *Kotteakos* "had substantial and injurious effect or influence in determining the jury's verdict" standard was adopted for habeas cases, as opposed to direct appeals such as *Satterwhite* was. Woods' reliance on

---

*See, e.g.,* the following from the cited pages of *Holloway, viz*: "when a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital offense, reversal is automatic." *Id.*, 98 S.Ct. at 1181.

26

*White* is misplaced.[18]

To show prejudice and that Dr. Garcia's future dangerousness testimony would be considered as based on his pre-trial examination, Woods points to statements in the prosecutor's closing sentencing argument, namely,

> "And talking about this particular defendant, the pain he probably would cause in the future, as Dr. Garcia told you, Dr. Garcia testified from the hypothetical situation, where the facts of this case were the same, *after he had talked to this defendant he formed an opinion* as to what this defendant would do if he had done that type of act. He said that it was more likely than not the defendant would commit violent acts in the future. That's what Dr. Garcia testified to. The psychiatrist, *he's talked to the defendant*. He's trained in that area. You don't have to take his word for it. It's your final decision to make, as it should be. But that's what he said, that's what he testified to." (Emphasis added).

---

Woods also cites *Gholson v. Estelle*, 675 F.2d 734 (5th Cir. 1982), where we affirmed the grant of habeas relief for error in admitting testimony of two psychiatrists, Drs. Holbrook and Grigson, expressly based on their pre-trial examinations of the defendants contrary to *Smith*. Dr. Holbrook "testified both defendants were sociopaths" and that "their failure to demonstrate 'remorse' during the interview indicated there was a probability they would commit criminal acts of violence in the future that would constitute a continuing threat to society." *Id*. at 737. Dr. Grigson testified "defendant Gholson was a sociopath 'at the very end of the scale in terms of severity' and, if given the chance, he would commit acts of criminal violence that would be a threat to society." *Id*. "Both doctors testified that defendants exhibited a lack of remorse, which was a quality, the doctors testified, indicating a sociopathic tendency" and "the doctors admittedly relied upon defendants' silence [at their pre-trial interviews with the doctors] regarding their guilt or innocence in reaching their conclusions." *Id*. at 740. Obviously, all that is a far cry from the present case. Further, while *Gholson* does not address whether an automatic reversal or some form of harmless error standard applies, the concurring opinion there states "I cannot say, as Texas urges, that we can conclude that the constitutional errors were harmless beyond a reasonable doubt." *Id*. at 745. Clearly, *Gholson*—decided before *Satterwhite* and *Brecht* but after *Holloway*—applied either a *Chapman* standard or a *Holloway* automatic reversal approach. *Gholson*, like *White*, is inapposite.

And, a few pages later in the transcript,

> ". . . we can prove to you there's a probability he will [commit violent acts], and that's as close as you can ever get and Dr. Garcia testified to that, more likely than not the defendant would commit a violent act in the future."[19]

However, Dr. Garcia did *not* testify that his opinion, that one who committed an offense like the instant one five years after being sentenced to the penitentiary for rape would be "more likely" to commit continuing acts of violence, was based on his examination of Woods. The doctor's testimony refused to relate anything about his examination of Woods specifically (other than that he had examined him for competence and found him to be so), and hence indicated that his said opinion was *not* based on his examination. Nor did the prosecutor expressly assert that Dr. Garcia's referenced opinion was actually (or likely) based on his examination of Woods (or that Dr. Garcia had so testified); he rather sought to inferentially and indirectly suggest that such was likely the case.[20]

---

The prosecutor's other brief inferences to Dr. Garcia's testimony were essentially efforts to mitigate its aspects that were unfavorable to the prosecution. Thus, the prosecutor argued "No way we can prove to an absolute certainty what the defendant would do in the future, and Dr. Garcia testified to that." What Dr. Garcia actually said, however, was that prediction was not merely short of "an absolute certainty," but was not even "very accurate." Again, the prosecutor argued "But there's some people, ladies and gentlemen, as the Dr. testified, there are some people who never change . . . ." While Dr. Garcia did say this, he did not say (and the prosecutor did not assert that he did) that Woods was such a person; in fact, Dr. Garcia expressly declined to so state.

While the argument in this respect improperly went beyond Dr. Garcia's testimony, complaint in that particular respect is procedurally barred by failure to object, as the state habeas court

28

We recognize that a prosecutor's argument is properly looked to and taken into account in evaluating whether certain testimony was prejudicial. Indeed, in *Satterwhite* the Court called attention to the prosecutor's argument respecting Dr. Grigson's testimony. *Id*., 108 S.Ct. at 1799.[21] But there is a crucial difference. In *Satterwhite*, as we have noted, Dr. Grigson's testimony was both confessedly based on his examination of the defendant and "powerful and unequivocal." The prosecutor there, who accurately characterized Dr. Grigson's testimony, was recalling to the jury and bringing into its focus "the powerful content of his [Dr. Grigson's] message." *Id*. Not so here. Here the prosecutor was trying to make an imitation silk purse out of the sow's ear which was Dr. Garcia's testimony. And he tried to exercise some damage control in that respect. But there is no reasonable likelihood that he changed the impact of Dr. Garcia's testimony in the minds of the jury. We must come back to what that testimony actually was. As noted, it was equivocal, uncertain, and confessedly not "very accurate," and it did not purport to be based on examination

_____

found (see note 11, *supra*).

The Court stated:

"The District Attorney highlighted Dr. Grigson's credentials and conclusions in his closing argument: 'Doctor James Grigson, Dallas psychiatrist and medical doctor. And he tells you that on a range from 1 to 10 he's ten plus. Severe sociopath. Extremely dangerous. A continuing threat to our society. Can it be cured? Well, it's not a disease. It's not an illness. That's his personality. That's John T. Satterwhite.'" *Id*.

29

of Woods or assessment of his personality. Without pretense of special insight beyond that generally possessed by "members of the judicial system," Dr. Garcia simply made the common sense observation—obvious to the jury anyway—that one who, having recently been released from prison for attempted rape, had committed such a brutal and savage offense as shown by the evidence here, was "more likely"—presumably "more likely" *than* those not having committed such offenses—to commit future acts of violence.

The complained of references to Dr. Garcia's testimony constitute less than a tenth of the prosecutor's sentencing argument. The real strength of the prosecution case on future dangerousness was the nature of the crime itself—the late night entry into a stranger's upstairs apartment, the extended and repeated hands-on, brutally savage beating, mauling, and sexual abuse of the sixty-three year old, ill and crippled female victim until, bloody and smeared with feces, she eventually died with a fractured skull and hyoid bone fractured on both sides—coupled with the 1970 conviction and fifteen-year sentence for attempted aggravated rape in 1969, from which Woods had doubtless not long been released from prison when the instant offense was committed in 1975.[22] This was the main focus and theme of the prosecutor's

---

[22] *Cf. Joiner v. State*, 825 S.W.2d 701, 704 (Tex. Crim. App. 1992) ("'. . . the circumstances of the offense and the facts surrounding it may furnish greater probative evidence than any other evidence regarding the probability of future acts of violence.' *Alexander v. State*, 740 S.W.2d 749, 761 (Tex. Crim. App. 1987)"), *cert. denied*, 113 S.Ct. 3044 (1993). *See also, e.g., Holland v. State*, 761 S.W.2d 307, 325 (Tex. Crim. App. 1988) ("such circumstances [of the charged offense] may alone, if severe enough, be sufficient to support an affirmative answer to the second

sentencing argument from beginning to end.  Thus, for example, the

prosecutor argued:

> "I don't see how any reasonable person listening to
> this evidence, seeing this picture, it's not fun to look
> at.  But it's very necessary, ladies and gentlemen, for
> you, in such an important position as you are in, to know
> exactly what went on in that apartment, because this
> particular defendant was there doing it and he was
> hitting that lady with his fists and he was actually
> doing the brutal things that you see in these pictures
> and I think you have every right to see them and a duty
> to look at them and consider what he would do in the
> future.  If that doesn't indicate or prove to you beyond
> a reasonable doubt that he would be more likely than not
> to commit a violent act in the future, I don't see
> whatever could.  That's even if he had never done
> anything before.  What kind of a person does it take to
> do that, to absolutely beat someone that much?  Can you
> imagine how many times he had to hit that lady or kick
> or, whatever he did, how many times he continued to do it
> and strangled her to make sure she was dead, over and
> over again?  What I just can't see anybody saying, 'Well,
> a person like that, will do something like that, probably
> wouldn't commit a violent act in the future.'  How could
> you say that?  I don't see how you could, especially
> faced with the fact what he had done in the past, just
> five years ago, and you can take those penitentiary
> records back in the jury room.  I think you have already
> read them pretty closely, and there is his picture.  It
> doesn't look like he does today in his suit.  He didn't
> look like he does today when he took Mrs. Ehatt's life.
> Look at that.  Is that what he fashioned himself as?
> Savage [Woods' shirt had 'savage' on it]?  And is our
> society supposed to just sit by and let somebody like
> that have the opportunity to pummel someone into oblivion
> with a record like he's got, of the similar type felony
> committed just five years earlier?"[23]

---

interrogatory"), *cert. denied*, 109 S.Ct. 1560 (1989); *Carter v. State*, 717 S.W.2d 60, 69 (Tex. Crim. App. 1986) (". . . the circumstances of the capital offense charged, if severe enough, can be sufficient to sustain an affirmative finding as to a defendant's likelihood to commit future acts of violence"), *cert. denied*, 108 S.Ct. 467 (1987); *Santana v. State*, 714 S.W.2d 1, 8 (Tex. Crim. App. 1986) (same).

The prosecutor went on to argue:

> "The only answer to number two, is there a

31

After the jury had returned its answer to the punishment special issues and been polled, the trial judge thanked them for their service, and went on to state, apparently spontaneously:

> "First I want to say that, I want to commend the attorneys, both the state and defense. Also, for what it's worth to you, I agree with your verdict. I was district attorney for about eight years, and to me, this was one of the most unconscionable, brutal, vicious slayings I've ever even known, and in view of his past record, conduct and viciousness of this case, I want you to appreciate your service."

We conclude that under the *Brecht* standard Dr. Garcia's testimony and the prosecutor's argument respecting it did not have a substantial and injurious effect or influence in determining the

---

probability he will commit violent acts in the future, and the actual wording probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society, if he would not be a continuing threat to society, I don't know who would, ladies and gentlemen. I just don't see how you could ever have a case more in need of a yes answer than this. . . . I don't see how any case or any defendant's actions could ever be demonstrated any more graphically than he has left for you, the defendant, this trail of felony conviction for attempted rape and this poor lady that just happened to be home that morning at three o'clock in the morning. It could have been anybody I guess, he just happened to see her through the window or break in her back door, then turn on the light."

Earlier the prosecutor had referred to "people who would do a premeditated act, break into somebody's house and killing the people inside. What type of thinking does that take? That's the type of person that's going to continue to do that type of thing in the future." Later, the prosecutor urged that Woods had "demonstrated he's not going to be changed twice now." Earlier, he had pointed out that Woods "attempted to rape a woman by force and arms in 1970, got fifteen years for that and gets out, in 1975 does the same thing or goes a little farther that time, to say the least, and actually kills the lady." Still earlier, the prosecutor noted that the photographs in evidence "doesn't [sic] even come close to getting you to understand what she [Ehatt] felt like when she went through that horrible death. And how much time it took her to die, we don't know, but those little photographs I'm sure don't scratch the surface of what she felt when she left the earth."

jury's verdict.

II. Other Contentions

**A.** Woods asserts that "[t]he operation of the Texas capital sentencing scheme in this case forced defense counsel to withhold available mitigating evidence, thereby depriving Mr. Woods of his right to the assistance of counsel, and to an individualized sentencing determination."

This claim is without merit. We have consistently held that a *Penry v. Lynaugh*, 109 S.Ct. 2934 (1989), claim may not be predicated on "evidence" which was not offered or tendered (conditionally or otherwise) at trial. *See, e.g., Briddle v. Scott*, 63 F.3d 364, 377-378 (5th Cir. 1995), and cases cited therein. "We have likewise consistently rejected the related argument that the Texas statutory capital sentencing scheme is invalid as preventing or chilling defense counsel's development of mitigating evidence." *Id*. at 378, citing *Lakey v. Scott*, 28 F.3d 486 at 490 (5th Cir. 1994), *cert. denied*, 115 S.Ct. 743 (1995); *Crank v. Collins*, 19 F.3d 172 at 176 (5th Cir.), *cert. denied*, 114 S.Ct. 2699 (1994); *Black v. Collins*, 962 F.2d 394 at 407 (5th Cir.), *cert. denied*, 112 S.Ct. 2983 (1992); *May v. Collins*, 948 F.2d 162 at 166-68 (5th Cir. 1991), *cert. denied*, 112 S.Ct. 907 (1992).

**B.** Woods next claims that the Texas punishment special issues function as aggravating circumstances, but are unconstitutionally vague for this purpose absent proper limiting instructions, and hence violate the rule of *Maynard v. Cartwright*,

33

108 S.Ct. 1853 (1988), and *Walton v. Arizona*, 110 S.Ct. 3047 (1990). We rejected essentially the same contention in *James v. Collins*, 987 F.2d 1116, 1119-20 (5th Cir.), *cert. denied*, 114 S.Ct. 30 (1993), and consequently we overrule Woods' claim in this respect. In *Jurek v. Texas*, 96 S.Ct. 2950, 2955-57 (1976), the Court held that the constitutionally required narrowing function, performed in many other jurisdictions at the sentencing phase by aggravating circumstances, under the Texas scheme was adequately performed at the guilt/innocence stage by the narrow categories of murder meeting the statutory definition of capital murder, the only offense for which the death sentence could be imposed. This analysis was confirmed in *Lowenfeld v. Phelps*, 108 S.Ct. 546, 554-555 (1988). In such a setting, further narrowing is not required at the punishment phase. *Lowenfield* at 555. Further, *Jurek* held that the Texas punishment phase issues do not function as aggravating circumstances, *id*. at 2956, but rather adequately "guide and focus the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death." *Id*. at 2957. *Jurek* expressly rejects the contention that the second punishment issue is impermissibly vague. *Id*. at 2957-58. We have likewise frequently rejected challenges to the lack of definition of diverse terms in the first two punishment special issues. *See Milton v. Procunier*, 744 F.2d 1091, 1095-96 (5th Cir. 1984) ("deliberately," "probability," and "criminal acts of violence" "have a plain meaning of sufficient content that the discretion

34

left to the jury" is "no more than that inherent in the jury system itself"), *cert. denied*, 105 S.Ct. 2050 (1985); *Thompson v. Lynaugh*, 821 F.2d 1054, 1060 (5th Cir.) ("deliberately" and "reasonable doubt" need not be defined as their "common meaning is sufficiently clear to allow the jury to decide the special issues on punishment"), *cert. denied*, 108 S.Ct. 5 (1987); *James* at 1120 (not necessary to define "deliberately," "probability," "criminal acts of violence," or "continuing threat to society"); *Nethery v. Collins*, 993 F.2d 1154, 1162 (5th Cir. 1993) (not necessary to define "deliberately," "probability," or "society"). *See also Pulley v. Harris*, 104 S.Ct. 871, 879 n.10 (1984) (Texas punishment issues are not impermissibly vague as they have "a common sense core of meaning").

**C.** Woods claims he was denied effective assistance of counsel in that his counsel did not present evidence of Woods' "history as an abused child" before he was adopted at approximately age eight or of his allegedly being mentally ill. The state habeas court rejected these contentions. Defense counsel's affidavits, findings in accordance with which were made by the state habeas court, reflect that counsel determined not to focus on Woods' pre-adoption family life because Woods was twenty-nine at the time of the offense and his brother, adopted at the same time and raised in the same household, had no propensity for violence or criminal behavior. Woods was lucid and communicative in the presence of counsel, exhibited no indication of mental disorder, and was capable of communicating with and understanding counsel. As a

35

precautionary measure, counsel had him examined by psychiatrist Dr. Byrd, known to be defense-oriented, who found Woods competent to stand trial and sane at the time of the offense. Dr. Byrd characterized Woods as anti-social and mean and told counsel "that I did not want him (Dr. Byrd) to testify." The results of Dr. Byrd's examination were "so devastating" from a defense standpoint that counsel requested Dr. Byrd not to prepare a report. "Considering that Dr. Byrd was more defense-oriented in his evaluations than most psychiatrists" counsel "thought it best to refrain from psychiatric testimony in Mr. Woods' trial." Similarly, counsel were aware that Woods "had experienced problems with alcohol abuse" but, as a matter of trial strategy, elected not to introduce evidence of this because of counsel's experience that voluntary drug and alcohol abuse is not considered mitigating evidence by jurors. Woods does not assert that these findings of historic fact are not entitled to the presumption of correctness under 28 U.S.C. § 2254(d) or that the district court, which relied on counsel's affidavits in this respect, erred in not affording an evidentiary hearing as to these facts. We conclude that the failure of defense counsel to further explore psychiatric or psychological examination or evidence, or matters concerning Woods' problems with alcohol abuse or his early childhood, does not in these circumstances constitute constitutionally deficient performance under *Strickland v. Washington*, 104 S.Ct. 2052 (1984). *See, e.g., Andrews v. Collins*, 21 F.3d 612, 623-24 (5th Cir. 1994). Moreover, these avenues of exploration are potential two-edged

36

swords, and the instant case was tried before *Penry*. In such circumstances, counsel is not constitutionally deficient for failing to anticipate *Penry*. *See May v. Collins*, 904 F.2d 228, 234 (5th Cir. 1990) (Judges Reavley and King concurring), *cert. denied*, 111 S.Ct. 770 (1991). *Cf. Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992), *cert. denied*, 114 S.Ct. 97 (1993) (that there was not "cause" excusing counsel's procedural default does not mean that counsel's performance was constitutionally deficient).

There is a conflict in the affidavits before the state habeas court respecting the degree of contact between defense counsel and Woods' adoptive parents, and whether the latter indicated the desire not to testify. The state habeas court credited the affidavits of defense counsel, finding that the adoptive parents expressed their unwillingness to testify. We have held that such findings are entitled to a presumption of correctness under section 2254(d). *See Briddle* at 378 n.27; *Carter v. Collins*, 918 F.2d 1198, 1202 (5th Cir. 1990) (citing cases). Woods does not argue that this finding is not entitled to the section 2254(d) presumption, or that the district court erred in denying him an evidentiary hearing.[24] But even if the adoptive parents' affidavits

---

The only reference in Woods' briefs in this Court to an evidentiary hearing is a single sentence, unsupported by argument or citation of authority, and not set out as a separate contention or ground of error, in Woods' *reply* brief that "[a]t the very minimum, an evidentiary hearing on the issue is necessary at which the relative credibility of counsel and the adoptive parents could be weighed." This does not suffice to preserve the matter for appellate review. *See, e.g., Stephens v. C.I.T. Group Equipment Financing, Inc*., 955 F.2d 1023, 1026 (5th Cir. 1992). *See also, e.g., United States v. Hoster*, 988 F.2d 1374, 1383 n.25 (5th Cir. 1993); *United States v. Collins*, 972 F.2d 1385, 1393 n.5 (5th Cir.

37

are accepted as accurate, no showing of prejudice is made.  Their affidavits were essentially that Woods had generally been a good boy, but started drinking when his brother went in the army, and later was admitted to the state hospital for brief stays on two occasions, once in 1965 and once in 1966 or 1967, "for help with his drinking problems."  After this, he married and settled down, but was later divorced.  The affidavits indicate that the adoptive parents essentially lost contact with Woods after he moved to Louisiana some time in or before 1969.

However, counsel had made the strategic decision not to go into Woods' drinking problems[25] or to further explore psychiatric evidence after Dr. Byrd's evaluation, and, as noted, these decisions were not constitutionally deficient, and such evidence clearly had the potential to backfire.  As to the balance of what is reflected in the affidavits of Woods' adoptive parents—indeed, as to the entirety of what is stated therein—there is no reasonable probability that had such information been presented at trial the result would have been different, and nothing in these affidavits undermines our confidence in the outcome.  Thus the *Strickland* prejudice prong is not satisfied.  *See, e.g., Glass v. Blackburn*, 791 F.2d 1165, 1170-71 (5th Cir. 1986) (no reasonable probability of different result from putative mitigating testimony of relatives and friends who would plead for defendant's life and describe his

---

1992).

[25] There is no evidence Woods was intoxicated at the time of the offense.

difficult home life as a youth, his father's alcoholism, and his sensitive and decent nature, in light of the nature of murders and "the mental anguish endured by the victims, leading up to and during their senseless murders . . . [which] was exquisite"). *See also Andrews* at 624; *Callins v. Collins*, 998 F.2d 269, 278-79 (5th Cir. 1993), *cert. denied*, 114 S.Ct. 1127 (1994); *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992), *cert. denied*, 113 S.Ct. 3035 (1993).[26]

Woods' complaints of ineffective assistance of counsel fail to meet the *Strickland* criteria, and are therefore rejected.

**D.** Woods next contends that the Texas Court of Criminal Appeals, in ruling on his ineffective assistance of counsel claims in his second and subsequent habeas petitions, denied him equal protection of the laws by applying the *Strickland* test rather than "the less stringent 'totality of the circumstances' standard" of *Ex parte Duffy*, 607 S.W.2d 507 (Tex. Crim. App. 1980), which that

---

Woods also complains of two brief sentences in counsel's argument about not calling his parents and Woods not being a "good guy." This was done to diffuse the prosecutor's possible comments in this respect, and we are unable to say that it was either constitutionally deficient or that there is any reasonable probability that but for these remarks the result would have been different.

In a footnote on page 75 of his brief, Woods asserts that his counsel rendered ineffective assistance on appeal and on the first of his three state habeases. We reject this contention as facially deficient. There is no constitutional entitlement to counsel on state habeas (nor, for that matter, does Woods specify any deficiencies or prejudice). *See Coleman v. Thompson*, 111 S.Ct. 2546 (1991). Woods (among other things) does not specify any argument not made which if made would probably have (or even which he contends would probably have) resulted in reversal on direct appeal; he thus fails to allege prejudice. There was plainly no total denial of counsel on appeal.

court applies when reviewing claims that counsel was ineffective at *sentencing* in *non*capital cases, citing *Ex parte Walker*, 777 S.W.2d 427, 431 (Tex. Crim. App. 1989). Even laying to one side the rule that deficiencies in state habeas proceedings do not constitute grounds for section 2254 relief as to the underlying conviction,[27] Woods' complaint in this respect lacks merit. Capital defendants are not any sort of suspect class, and so only rational basis scrutiny applies. *Gay v. Lucas*, 677 F.2d 1086, 1104 (5th Cir. 1982), *cert. denied*, 103 S.Ct. 1886 (1983). As expressly pointed out in *Strickland*, there is a rational basis for concluding that the role of counsel in noncapital *sentencing*, which typically is more informal and involves essentially "standardless discretion in the sentencer," "may require a different approach to the definition of constitutionally effective assistance" than that appropriate to capital sentencing which "is sufficiently like a trial in its adversarial format and in the existence of standards for decision . . . that counsel's role in the proceeding is comparable to counsel's role at trial." *Strickland* at 2064.

**F.** Claim is also made that the instruction that the jury could not answer any punishment special issue "no" unless at least ten jurors concurred in that answer violated the rule of *Mills v. Maryland*, 108 S.Ct. 1860 (1988).[28] We reject this contention.

---

*See Nichols v. Scott*, 69 F.3d 1255 at 1275 (5th Cir. 1995), and authorities there cited.

The jury was, of course, at the same time told it could not answer any special issue "yes" unless all twelve concurred in that answer. If the requisite agreement (either way) was not achieved, there would be no verdict, and a mistrial would follow.

As we pointed out in *Jacobs v. Scott*, 31 F.3d 1319, 1328-29 (5th Cir. 1994), *cert. denied*, 115 S.Ct. 711 (1995), this claim lacks substantive merit as the instruction at issue is wholly dissimilar to that involved in *Mills*. Further, Woods' sentence became final in 1981, many years before *Mills* was handed down, and accordingly, as we held in *Nethery*, 993 F.2d at 1162, and in *Cordova v. Collins*, 953 F.2d 167, 172-73 (5th Cir. 1992), it is barred under *Teague v. Lane*, 109 S.Ct. 1060 (1989), as a new rule not dictated by precedent existing when Woods' conviction became final.

**G.** Woods urges that Texas law unconstitutionally prevented him from presenting at the sentencing hearing "an expert prepared to testify that he would be required by law to serve at least 20 years in prison before becoming eligible for parole." We note that although the prosecutor argued future dangerousness, he did not, contrary to what Woods seems to contend, ever argue or suggest that Woods would or might be paroled if not sentenced to death, much less that he might be paroled sooner than twenty years.[29] Woods relies on *Simmons v. South Carolina*, 114 S.Ct. 2187 (1994), but *Simmons*—decided long after Woods' conviction became final—involved a statutory bar against *ever* being paroled.

We conclude that to apply *Simmons* here would violate the

We note that the trial court instructed the jury at sentencing that it was not to consider the length of time Woods would serve to satisfy a life sentence. There was no objection to this instruction and Woods has not complained of it in this proceeding. Jurors are presumed to follow their instructions, *Richardson v. Marsh*, 107 S.Ct. 1702, 1707 (1987), and there is no reason to assume that they did not do so in this instance.

nonretroactivity principle of *Teague*. *See Allridge v. Scott*, 41 F.3d 213, 222 n.11 (5th Cir. 1994), *cert. denied*, 115 S.Ct. 1959 (1995). Even apart from *Teague*, we would have to reject Woods' claim, for the same reasons we have rejected similar claims that juries must be informed of Texas parole laws (which at no time have prevented parole from *ever* being given). *See Allridge* at 220-222; *King v. Lynaugh*, 850 F.2d 1055, 1060 (5th Cir. 1988) (en banc), *cert. denied*, 109 S.Ct. 820 (1989); *Andrade v. McCotter*, 805 F.2d 1190, 1192 (5th Cir.), *stay denied*, 106 S.Ct. 1524 (1986);[30] *O'Bryan v. Estelle*, 714 F.2d 365, 388-89 (5th Cir. 1983), *cert. denied*, 104 S.Ct. 1015 (1984). *Cf. California v. Ramos*, 103 S.Ct. 3446, 3458-60 (1983). There is little reason to believe that a jury would conclude that Woods would not constitute a danger to society (including that of the prison in which he would be incarcerated) if he were released in twenty years but would constitute such a danger if released in twelve or fourteen years. *Cf. King* at 1061. Indeed, as we remarked in *King*, "a suggestion to prospective jurors that" the defendant "might return to [free world] society in twenty years could very easily have predisposed them to impose a death sentence." *Id*. A state can legitimately conclude that it is

---

In *Andrade v. McCotter*, we found that the following claim did not state a valid basis for a certificate of probable cause, *viz*:

> "During the punishment phase deliberations, the jury asked if Andrade would be eligible for parole if he received a life sentence. Andrade asked the court to instruct the jury that one convicted of capital murder would not be eligible for parole until after serving 20 years. The court declined to answer the inquiry." *Id*. at 1190.

preferable to instruct the jurors, as they were instructed here (see note 29, *supra*), not to consider such matters. *See Ramos*. That is distinct from the *Simmons* situation where there can never be parole.

Finally, in any event the claim is procedurally barred, as ruled by the state habeas court in Woods' final state habeas. Woods never offered or tendered any evidence concerning when he would be eligible for parole, and never requested any instruction in that regard, nor in any other manner ever raised the present issue at trial. There is indeed nothing to suggest that Woods had any desire at all to have parole considerations brought to the jury's attention.[31] For all the record reveals, he might have objected to any such action. Woods has not shown—or attempted to show—cause for the failure to raise this matter at trial. It is procedurally barred. *See McCoy v. Lynaugh*, 874 F.2d 954, 958 (5th Cir.), *stay denied*, 109 S.Ct. 2114 (1989).

**G.** Complaint is next made that the prosecutor violated *Booth v. Maryland*, 107 S.Ct. 2529 (1987), and *South Carolina v. Gathers*, 109 S.Ct. 2207 (1989), by introducing the testimony of the victim's sister, which Woods characterizes as "wholly unnecessary," and by references to the sister in the prosecution's sentencing phase argument. Woods fails, however, to cite *Payne v. Tennessee*, 111

---

And, contrary to the suggestion in Woods' present brief, there is nothing to indicate that he ever had available or sought the services of any parole "expert." Moreover, Woods never objected to the portions of the prosecutor's punishment argument he now calls attention to (and mischaracterizes) in this connection. This also was found a procedural bar by the state habeas court.

S.Ct. 2597 (1991), which largely overruled *Booth* and *Gathers*. We reject Woods' contention.

To begin with, this claim is procedurally barred, as the state habeas court ruled, because no objection was made to the sister's testimony or to the now complained of portions of the prosecution's argument. No "cause" for the failure to object is shown or even claimed.

Further, we see no constitutional violation under *Payne*. The sister's testimony identified the decedent, as the state had the burden to do, and established that she had to use a walker, was weakened by illness, and was sixty-three and lived alone; and the sister likewise identified the pill bottle and bracelet in Woods' possession as the decedent's, establishing the robbery element of the capital murder. The prosecutor's two brief, passing references to the sister's painful sorrow were not so inflammatory as to render the sentencing proceeding "fundamentally unfair." *See Payne* at 2608, 2612, 2614. There was no argument or evidence concerning the "opinions of the victim's family about the crime, the defendant, and the appropriate sentence." *Id*. at 2612. The state may properly determine that "for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." *Id*. at 2608.

We reject Woods' contentions in this respect.

**H.** Based on examination in 1988 by a psychologist retained by Woods' habeas counsel, it is contended that Woods is a person of

44

borderline mental retardation and is immature and is therefore not now eligible for execution. We reject this claim. Woods overstates the psychologist's conclusions,[32] but in any event his claim is foreclosed by *Penry*, 109 S.Ct. at 2956-58.

**I.** Woods next contends that he was incompetent to stand trial due to sleep deprivation. No evidence supports this contention.[33] Further, the state habeas court concluded Woods was competent and there is no contention that its findings in this

---

The psychologist's report (also quoted in part in note 7, *supra*) says, "The result of IQ testing showed that Mr. Woods is functioning in the Low Average range of intelligence but his true intellectual potential is probably higher than is indicated by this classification." The report also says Woods was "alert, friendly and cooperative . . . oriented appropriately to time, person and place; no signs indicative of delusions or hallucinations were evident," and that "both receptive and expressive communication modalities were intact and functional, and the same was true of short- and long-term memory. No signs or symptoms indicative of lateralized brain damage were observed, and there was no evidence of bilateral weakness or motoric dysfunctions." The report further states that although Woods' "psychological functioning presently is less than average intellectually," nevertheless "he possesses sufficient psychological resources for a better than average adjustment."

Three doctors and both his lawyers considered Woods competent to stand trial. In a 1990 affidavit, Woods states that during the trial he "rarely received more than two or three hours sleep a night" and "[c]onsequently, it was very difficult for me to stay awake and to pay attention and understand what was going on at the trial." This says, at most, that it was "very difficult," not that Woods could not and did not do so. Reference is also made to counsel's affidavit stating that "on several occasions" he had to "nudge" Woods "to keep him awake" during trial. But this same affidavit, as well as other counsel's, plainly reflect that Woods was competent and "always lucid and communicative in our presence" and "capable of communicating with and understanding his counsel." This does not show incompetency. *See McCune v. Estelle*, 534 F.2d 611, 612 (5th Cir. 1976). It does not suffice to "positively, unequivocally and clearly generate a real, legitimate and substantial doubt as to the mental capacity" of Woods. *See Enriquez v. Procunier*, 752 F.2d 111, 114 (5th Cir. 1984).

45

respect are not entitled to the presumption of correctness. We reject this contention.

**J.**   The remaining and final complaint raised by Woods on this appeal is that introduction of eight photographs of the deceased's body violated Woods' Eighth Amendment right to a fair trial. We reject this contention.

"In reviewing state evidentiary rulings, our role is limited to determining whether a trial judge's error is so extreme that it constituted denial of fundamental fairness." *Evans v. Thigpen*, 809 F.2d 239, 242 (5th Cir.), *cert. denied*, *stay denied*, 107 S.Ct. 3278 (1987) (quoting *Mattheson v. King*, 751 F.2d 1432, 1445 (5th Cir. 1985), *cert. dismissed*, 106 S.Ct. 1798 (1986)); *Herrera v. Collins*, 904 F.2d 944, 949 (5th Cir.), *cert. denied*, 111 S.Ct. 307 (1990).

Under Texas law, photographs are admissible regardless of their inflammatory nature if they are competent, material, and relevant, and unless they are offered *solely* to inflame the minds of the jury. *See, e.g., Reimer v. State*, 657 S.W.2d 894, 896 (Tex. App.—Corpus Christi 1983, no writ). Even inflammatory photographs introduced *primarily* to inflame the jury are nevertheless admissible. *Id*.

The photographs were introduced during the testimony of the police officers who discovered the body and arrested Woods at the apartment. In addition to identifying the deceased, the photographs served to illustrate and make more understandable the officers' testimony which described the apartment and its condition, and the location and condition of the deceased's body

46

and the nature and extent of the injuries to the deceased. These are certainly legitimate purposes. Woods does not contend that any of the photographs were unrepresentative or misleading respecting either the condition of the victim or the crime scene. Moreover, he in essence does not dispute that introduction of three or "even" four such photographs would have been permissible, but contends that eight was, in effect, overkill. However, as the district court observed, each of the photographs, with the sole exception of numbers 3 and 4, shows injuries and details that the others do not. It is entirely clear that photographic evidence of the kind introduced was entirely proper, and that to the extent more was used than appropriate this did not go so far as to render Woods' trial fundamentally unfair.

## Conclusion

Woods' appeal fails to demonstrate any reversible error in the district court's denial of habeas relief. Accordingly, the judgment of the district court is

AFFIRMED.

47