IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 19, 2009

Charles R. Fulbruge III
Clerk

No. 08-70007

GAYLON GEORGE WALBEY, JR.

Petitioner-Appellant

V.

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

Respondent-Appellee

Appeal from the United States District Court
for the Southern District of Texas
No. 3:99-CV-496

Before HIGGINBOTHAM, WIENER, and BARKSDALE, Circuit Judges.

PER CURIAM:[*]

This appeal is the latest proceeding in a habeas case that has been before five courts a total of seven times. The trial courts that actually received evidence, the Texas habeas trial court (the "THTC") and the federal magistrate judge, both recommended relief, only to be reversed by reviewing courts. For reasons that we explain below, we are persuaded that those reversals were error and that the findings of fact made in the federal proceedings entitle Petitioner

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Gaylon George Walbey, Jr. to relief for ineffective assistance of counsel ("IAC"), which relief must take the form of either a new punishment phase of his capital trial or imposition of the appropriate non-capital alternative sentence. Accordingly, we reverse the district court's denial of relief and remand for entry of a writ of habeas corpus in accordance with 28 U.S.C. § 2254.

## I. FACTS AND PROCEEDINGS

We provided a summary of the factual and procedural history of this case the last time it was before us in Walbey v. Dretke (Walbey IV).[1] We address here only that appeal and the subsequent proceedings on remand, referring the reader to our prior opinion as needed for further background.

In our prior opinion, we concluded that the findings of fact made by the THTC did not survive the decision by the Texas Court of Criminal Appeals (the "TCCA") to deny Walbey a new punishment phase of his trial. Accordingly, "[a]s the state habeas trial court's proposed factual findings did not survive appellate review, and as the opinion of the TCCA did not resolve the factual dispute regarding trial counsel's credibility and his investigation of the mitigation defense," we remanded to the district court for "a de novo evidentiary hearing into Walbey's claims that counsel was ineffective for those asserted failures at the punishment phase of his trial."[2]

On remand, the district court referred the case to a magistrate judge to conduct the required evidentiary hearing. The magistrate judge took testimony from Roger Ezell (Walbey's trial counsel), Dr. Curtis Wills by deposition (one of the two psychologists who testified on Walbey's behalf at trial), Lynn Moyer (a former counselor for Child Protective Services who knew Walbey as a child), Greg Green (the former Executive Director of the Yeager Crisis Center in

---

[1] 100 F. App'x 232, 233-34 (5th Cir. 2004) (per curiam) (unpublished).

[2] Id. at 236.

Galveston, who knew Walbey as child), Juanita Jimenez (a former employee of the Yeager Center who knew Walbey as a child), and Dr. Edward Gripon (a psychiatrist with 33 years of experience who has testified as both a prosecution and defense expert in numerous capital cases).

The magistrate judge made extensive findings of fact. We refer the reader to that report and recommendation for a complete account, but provide an overview here.[3] In brief, the magistrate judge found Ezell's testimony about his investigation of sentencing issues for Walbey's capital trial not to be credible in light of the testimony of Dr. Wills, the expert primarily relied on by Ezell at trial. In preparation for the sentencing phase of the trial, Ezell only skimmed the records provided by the district attorney on Walbey's background and did not discuss the mitigation issue with Dr. Wills, even though Ezell claims that he relied on Dr. Wills to decide whether to pursue mitigation or future dangerousness as a defense strategy. Ezell failed to contact a number of potential witnesses, including Walbey's mother and those who had first hand knowledge of his troubled childhood and his relationship to the victim. Ezell did not investigate Walbey's relationship to the victim, despite admitting that there were no impediments to conducting such an investigation, to hiring a mitigation expert, or to preparing the mitigation issue — other than his claimed strategic choice.

In addition to the investigatory deficiencies found by the magistrate judge, Ezell was unable to offer any strategic reasons for many of his trial choices, such as (1) his failure to correct erroneous testimony by Walbey's grandmother that cut against mitigation, (2) his failure to present evidence about Walbey's relationship to the victim (other than that she briefly served as his foster mother), and (3) his failure on redirect to rehabilitate Dr. Wills's concession on

---

[3] Walbey v. Quarterman (Walbey V), No. 3:99-cv-00496 (Mag. S.D. Tex. Aug. 10, 2007).

the prosecution's cross-examination that Walbey's history would support a diagnosis of anti-social personality disorder, a fact that cuts against both mitigation and lack of future dangerousness, and a diagnosis that Dr. Wills did not think accurate.

Because Dr. Wills was not retained until a week before trial, he did not investigate the mitigation issue, did not read the entire file sent to him by Ezell, and spent a very limited amount of time preparing the future dangerousness issue and little time with Ezell preparing to testify. Dr. Wills thus presented no testimony on the mitigation issue. Dr. Gripon, Texas's expert at the post-conviction proceeding, offered some evidence about Dr. Wills's testimony that supported Texas's position, but much of it was favorable to Walbey.

At the hearing before the magistrate judge, Walbey introduced testimony from three persons and a "voluminous binder" of unopposed exhibits as proof of the facts that he claims Ezell should have presented during his sentencing. Ezell had presented almost none of this evidence. Several persons who had worked at the youth center where Walbey was placed by Texas's Child Protective Services testified to his quiet, shy, and non-aggressive nature, stating that he had done well in a structured setting. They were willing to testify on Walbey's behalf, but they had never been contacted by Ezell or Dr. Wills (although one had gone so far as to contact the district attorney's office, leaving her name and number, after hearing of the crime). A witness who worked with Walbey testified to the cruelty with which the victim had treated Walbey by her unexplained rejection of him and that Walbey's upbringing was among the worst she had seen. She also testified that despite being deeply hurt by the victim's rejection, Walbey did not become aggressive, instead turning his anger inward on himself. All provided details about Walbey's life and his relationship to the victim.

The records admitted about Walbey's childhood during the hearing before the magistrate judge describe a nightmarish hell of cruelty and neglect. Walbey was made to drink beer and smoke "joints" by ages two and a half to three and was left filthy, alone, and with unexplained marks on his body during the same time; was found wandering alone along a highway service road at age five; was kidnapped by his father — who abused his mother and had a drug and alcohol addiction — and hidden from his mother from ages five to ten; was repeatedly physically and mentally abused by his father and paternal grandmother, including a beating with a doubled over belt that lasted for forty-five minutes and broke the buckle; was forced to eat garbage while living in abandoned houses when he was locked out by (or ran away from) his father during the period of his kidnapping; was reunited with his mother after being discovered in an orphanage; took to petty theft; was hospitalized with a possible diagnosis of schizophrenia at age twelve, but did not receive the recommended follow-up care for that diagnosis because his mother "did not have the time"; and was abused by his mother — who had a drinking problem — when she drank.

At age thirteen, Walbey ran away from this environment and lived in vacant apartments, feeding himself by stealing food. He was hospitalized at the same age and ultimately diagnosed with an adjustment disorder secondary to stressful home life. The psychological profile constructed at the time indicated an extreme sensitivity to rejection and abandonment, low self-esteem, and an impoverished relationships with others. His mother refused treatment for him after his discharge from the hospital, despite being advised that he required continuing and long-term follow-up care. He was arrested for burglary, and the police had to issue a subpoena for the arrest of his mother because they could not contact her.

He was placed in a shelter at age thirteen, and his mother refused to take him home. Reevaluation by a psychologist determined that he suffered from

severely disrupted interpersonal relationships because of abandonment and isolation. He was diagnosed with a socialized, nonaggressive conduct disorder, later amended to include a schizotypal personality disorder. A Child Protective Services worker noted that his criminal behavior was "usually center[ed] around his need to survive on the streets during his episodes of running away."[4]

It was during this time that Walbey was placed with the victim, Marionette Beyah, as part of a foster parent program. After accepting him, she returned him to the youth center several months later with the explanation that she was going on vacation and needed someone to look after Walbey. She never returned for him, and the staff at the youth center were forced to tell Walbey that she did not want him back. According to the testimony before the magistrate judge, her rejection of Walbey was deeply hurtful to him.

Psychological notes made two years later while Walbey was living with another foster family showed improvement, but noted that regression was possible if a change in his living circumstances should occur; and those circumstances did change when the foster family moved. He murdered the victim about a year and a half later.

After finding these facts, the magistrate judge wrote a detailed report recommending that the district court grant Walbey IAC relief in the form of a new punishment-phase hearing. Unpersuaded, the district court denied relief in an unpublished order.[5] The court agreed with the magistrate judge's conclusion that Ezell's performance was deficient, yet did not agree that Ezell's deficient performance was prejudicial. It concluded that Rompilla v. Beard,[6]

---

[4] Id. slip op. at 42 (internal quotation marks omitted).

[5] Walbey v. Quarterman (Walbey VI), No. 3:99-cv-00496 (S.D. Tex. Feb. 20, 2008).

[6] 545 U.S. 374 (2005).

Wiggins v. Smith,[7] and Williams v. Taylor[8] were distinguishable from Walbey's case on the prejudice prong of the Strickland v. Washington[9] test for IAC. The district court offered five reasons for this conclusion: "(1) trial counsel outlined the same mitigating factors for the jury; (2) the record Walbey relies on contains unhelpful and aggravating information; (3) a full review of the record weakens the defense case; (4) Walbey's proposed augmentation of the mitigation defense opens the door to a stronger case for the death penalty; and (5) the brutal facts of the murder eclipse Walbey's mitigating evidence."[10]

Walbey obtained a certificate of appealability from the district court, and this timely appeal followed.

## II. ANALYSIS

### 1.    Standard of Review

In an appeal from the denial of habeas relief, we review a district court's legal conclusions de novo and its factual findings for clear error.[11]

### 2.    Analysis

#### a.  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")

Under AEDPA, before a petitioner is entitled to relief, he must show that the state court decision denying relief was "contrary to" or "an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court of the United States."[12]  A decision by a state court is "contrary to" clearly

---

[7] 539 U.S. 510 (2003).

[8] 529 U.S. 362 (2000).

[9] 466 U.S. 668 (1984).

[10] Walbey VI, No. 3:99-cv-00496, slip op. at 54-55.

[11] Goodrum v. Quarterman, 547 F.3d 249, 255 (5th Cir. 2008).

[12]  28 U.S.C. § 2254(d); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).  There are thorny issues concerning the applicability of AEDPA's deference provisions to the instant appeal.  As a matter of law of the case, our previous opinion could stand for the proposition

established Supreme Court precedent when it "applies a rule that contradicts the governing law set forth in [the Court's] cases," or reaches an opposite result from a Supreme Court case with facts that are "materially indistinguishable."[13] A state court's decision is an "unreasonable application of [the] Court's precedent if the state court identifies the correct governing legal rule from [the] Court's cases but unreasonably applies it to the facts of the particular . . . case."[14]  A state court's decision "also involves an unreasonable application of [the] Court's precedent if the state court either unreasonably extends a legal principle from [the Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."[15]  A state court's decision must be incorrect and objectively unreasonable.[16]

### b. Walbey's Claim of Ineffective Assistance of Counsel

We analyze IAC claims under the conjunctive two-prong test of Strickland v. Washington.[17]  Relief from IAC is not appropriate unless a petitioner

---

that AEDPA's deference provisions do not apply because we instructed the district court to conduct not just an evidentiary hearing, but a de novo evidentiary hearing.  Aside from law of the case, it is also unclear whether § 2254(d) should apply after a remand pursuant to Micheaux v. Collins, 944 F.2d 231 (5th Cir. 1991) (en banc) (per curiam), the case on which we relied in our prior opinion.  Because the facts in this case entitle Walbey to relief under AEDPA, we need not determine whether his claims should be reviewed de novo.  The many interpretative difficulties AEDPA's deference provisions present, see generally Lee Kovarsky, AEDPA's Wrecks: Comity, Finality, and Federalism, 82 TUL. L. REV. 443 (2007) and Justin F. Marceau, Deference and Doubt: The Interaction of AEDPA § 2254(d)(2) and (e)(1), 82 TUL. L. REV. 385 (2007), dissuade us from unnecessarily resolving this issue.

[13] Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., concurring) (commanding a majority as to the cited section).

[14] Id. at 407.

[15] Id.

[16] Id. at 409-11.

[17] 466 U.S. 668 (1984).

demonstrates that (1) counsel's performance was deficient and (2) that deficient performance prejudiced the petitioner.[18]

When evaluating counsel's performance, we measure it against an objective standard of "reasonableness under prevailing professional norms."[19] Analysis under this standard begins with a "strong presumption that trial counsel's conduct falls within the wide range of reasonable professional assistance," and we must make "every effort . . . to eliminate the distorting effect of hindsight."[20] "Prevailing norms of practice as reflected in American Bar Association Standards and the like . . . are guides to determining what is reasonable . . . ."[21]

When, as with Walbey, a "petitioner's claim stems from counsel's decision to limit the scope of their investigation into potential mitigating evidence . . . [and] counsel attempt[s] to justify [the] limited investigation as reflecting a tactical judgment," the deference owed to such a strategic judgment turns on "the adequacy of the investigations supporting those judgments."[22] "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."[23]

The question "is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's

---

[18] Id. at 687.

[19] Id. at 688.

[20] Id. at 689.

[21] Id. at 688.

[22] Wiggins v. Smith, 539 U.S. 510, 521 (2003).

[23] Id. (internal quotation marks omitted).

decision not to introduce mitigating evidence . . . was itself reasonable."[24] "[C]ounsel should consider presenting . . . [the defendant's] medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences."[25] That is, "generally accepted standards of competence require that counsel conduct an investigation regarding the accused's background and character."[26] Of course, "Strickland [does not] require defense counsel to present mitigating evidence at sentencing in every case."[27]

To determine whether a petitioner has made a showing of prejudice when a sentence of death is challenged, we ask "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."[28] "A reasonable probability is a probability sufficient to undermine confidence in the outcome," but "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."[29] We must "evaluate the totality of the available mitigation evidence —both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation."[30]

---

[24] Id. at 523 (emphasis in original).

[25] Id. at 524 (emphasis in original).

[26] Miniel v. Cockrell, 339 F.3d 331, 344 (5th Cir. 2003).

[27] Wiggins, 539 U.S. at 533.

[28] Strickland v. Washington, 466 U.S. 668, 695 (1984).

[29] Id. at 694.

[30] Williams v. Taylor, 529 U.S. 362, 397 (2000).

i.    Performance

On the performance prong of Strickland, there is little room for debate that the district court was correct to agree with the magistrate judge's conclusion that Ezell's investigation of a potential mitigation defense was deficient. Ezell's mitigation investigation was severely limited. As noted, he only scanned the files sent to him on Walbey's background, and he did not (1) interview Walbey's mother or people who worked with him as a youth, (2) hire a mitigation expert, (3) reach an independent conclusion about the viability of a mitigation defense, instead delegating that task to an expert, which expert understood his role as limited to assessing only future dangerousness and spent two hours preparing the case, or (4) investigate the history of Walbey's relationship with the victim. There was essentially no effective investigation of the mitigation issue.

Reasonable professional judgment could not support such a limitation in light of case law that firmly establishes a duty to investigate the background and character of a capital defendant, along with his family and social circumstances and mental health history. Given the Texas law establishing that the facts of Walbey's crime are themselves legally sufficient to support a finding of future dangerousness, the virtually impossible battle that Ezell faced on future dangerousness makes all the more unreasonable Ezell's failure to investigate a mitigation defense thoroughly. So too does Dr. Wills's testimony that the two defenses were not inconsistent with each other in Walbey's case. Neither can there be any contention that the facts of Walbey's childhood were hidden or difficult to find; in fact, many were contained in a box delivered to Ezell by the district attorney that Ezell elected only to skim. Ezell's mere possession of "some information with respect to petitioner's background . . . [did not put him] in a position to make a tactical choice not to present a mitigation defense."[31]

---

[31]  Wiggins, 539 U.S. at 527.

In addition to Ezell's performance being deficient under Strickland, the TCCA's determination that it was not deficient is contrary to or an objectively unreasonable application of Williams.[32] The facts in Williams are almost identical to the facts of the subject case: (1) Counsel did not begin to prepare for the penalty phase of the proceeding until a week before trial (Dr. Wills was not retained until about week before trial, and Ezell contended that it was not until he and Dr. Wills spoke that he formulated a punishment-phase strategy); (2) counsel did not conduct an investigation that, had he done so, would have uncovered evidence of a nightmarish childhood (the magistrate judge's findings of fact establish that Ezell did not investigate Walbey's childhood); (3) the decision not to investigate potentially mitigating evidence was based on an erroneous legal conclusion (like Ezell's decision to focus on future dangerousness when Texas law dictates that the facts of Walbey's crime themselves are sufficient to prove this aggravating factor); (4) counsel did not introduce evidence that the defendant was borderline mentally retarded (Ezell did not introduce any of the mitigating evidence available from Walbey's mental health doctors, but instead allowed testimony from Dr. Wills that turned out to be aggravating); and (5) counsel did not introduce favorable evidence of the defendant's docility and did not introduce testimony that the defendant thrived in a structured environment (Ezell failed to investigate the latter two issues and, had he done so, would have discovered considerable evidence of the same). In fact, the magistrate judge found that Ezell "got the sense that [Walbey] had a terrible

---

[32] 529 U.S. 362 (2000).

childhood and upbringing, but conceded that he made no effort to investigate the information."[33]  This determination was not disturbed by the district court.[34]

    ii.    Prejudice

Having concluded that Ezell's performance was deficient, we turn to the prejudice prong of Strickland.  In support of its appellate argument that Walbey has failed to demonstrate prejudice, Texas adopts the five reasons given by the district court for its no-prejudice finding.  We address each in turn.

Texas first urges that Ezell outlined the same mitigating factors for the jury as Walbey now contends should have been presented.  In light of the plethora of mitigation evidence that Ezell failed to introduce at trial, however, the TCCA's no-prejudice conclusion was clearly incorrect under Lewis v. Dretke.[35] Given how little evidence was introduced at trial, holding that Walbey did demonstrate prejudice is also consistent with almost every piece of testimony by the mental health professionals who testified before the magistrate judge, whether for Texas or Walbey.  Even though Lewis is a pre-AEDPA case, so that it only speaks directly to whether the TCCA's IAC determination was correct, Williams establishes that the TCCA's decision was also an unreasonable application of clearly established federal law as determined by the Supreme Court.

In Williams, a case in which the Court found prejudice, counsel for Williams offered at sentencing

> the testimony of Williams' mother, two neighbors, and a taped excerpt from a statement by a psychiatrist. One of the neighbors

---

[33]  Walbey v. Quarterman (Walbey V), No. 3:99-cv-00496, slip op. at 47 (Mag. S.D. Tex. Aug. 10, 2007).

[34]  Walbey v. Quarterman (Walbey VI), No. 3:99-cv-00496, slip op. at 50-52 (S.D. Tex. Feb. 20, 2008).

[35]  355 F.3d 364, 368-69 (5th Cir. 2003) (per curiam).

had not been previously interviewed by defense counsel, but was noticed by counsel in the audience during the proceedings and asked to testify on the spot. The three witnesses briefly described Williams as a "nice boy" and not a violent person. The recorded psychiatrist's testimony did little more than relate Williams' statement during an examination that in the course of one of his earlier robberies, he had removed the bullets from a gun so as not to injure anyone.[36]

Williams thus stands for the proposition that counsel can be prejudicially ineffective even if some of the available mitigation evidence is presented and even if there is psychiatric testimony. The fact that the presentation of some mitigation evidence does not necessarily defeat a prejudice showing is also clear from the test that Williams establishes. There, the Court held that it is an unreasonable application of Supreme Court precedents for a state court not to "evaluate the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding."[37] This standard clearly contemplates that even when some mitigating evidence is presented at trial, prejudice is still possible if that evidence is substantially incomplete.

The mitigating evidence presented in the instant case was substantially incomplete. Some evidence of mitigation was presented by Ezell through the testimony of Walbey's maternal grandmother and his former foster parents, the Eckelses. But the testimony by Walbey's grandmother was inaccurate in several important respects. For example, she testified that Walbey had a normal childhood until he was kidnapped, that he had a normal relationship with his mother, and that his father had no criminal history. None of these statements

---

[36] 529 U.S. 362, 369 (2000). The weight of closing argument in Williams was "devoted to explaining that it was difficult to find a reason why the jury should spare Williams' life." Id. Several of Ezell's comments at closing are similar. For example, he said, "There's no question that this is a horrible crime. We'd be foolish to try to downplay it. It's an incredibly brutal crime against someone who tried to take care of him. . . . I am not telling you to take mercy on Gaylon Walbey for this terrible murder, this unspeakable murder." Walbey V, No. 3:99-cv-00496, slip op. at 13.

[37] Williams, 529 U.S. at 397.

is true, yet Ezell failed to correct them. Given the serious neglect and abuse of Walbey by his mother, particularly her refusal to provide the recommended mental health care after he was hospitalized more than once, his ingestion of drugs and alcohol before age 5, her abandonment of him, her drinking problem and severe physical and mental abuse of him, Walbey's grandmother presented a seriously distorted view of his childhood that painted one parent (conveniently enough, not her daughter) as abusive, but the other, her daughter, as benign. Further, the Eckelses' testimony was general and conclusional, and, regarding the abuse Walbey suffered, could not have been first hand.[38] Their testimony about Walbey's Child Protective Services' rating (a mere number) cannot be expected to have communicated to a jury the bloodcurdling facts of his upbringing.

The magistrate judge characterized the facts presented in mitigation at Walbey's trial as "scant, bereft in scope and detail" and concluded that Ezell's testimony that "these witnesses were able to convey to a jury the 'overall nature of [his upbringing], that [Petitioner] has had a very terrible childhood," was unpersuasive.[39] The district court offered nothing new when it rejected these conclusions by the magistrate judge. And, even if we were to accept arguendo that the jury did have enough accurate information about Walbey's family history, the experts who appeared before the magistrate judge made clear that the jury did not hear the compelling set of mitigating circumstances surrounding Walbey's relationship with the victim. It was in that context that, according to

---

[38] In fact, Linda Eckels testified that "at one point she probably knew of [Walbey's] problems and the particulars concerning his background or problems when he came into their home, but she could not recall any as she testified in front of the jury." Walbey V, No. 3:99-cv-00496, slip op. at 7. Richard Eckels testified that "he did not recall the details of [Walbey's] history at all and did not know DHS had custody of him — he simply knew [Walbey] had previous placements . . . [and] there was abuse, neglect, severe." Id. slip op. at 7-8.

[39] Id. slip op. at 23, 52 (alterations in original).

the uncontroverted testimony of the experts, Walbey's actions could be explained (even though not justified of course). The testimony of all the experts also highlighted the need for some explanation of a crime for a mitigation defense to succeed. Instead, Walbey was left with testimony by Dr. Wills that was unarguably aggravating. Even Texas's expert at the hearing before the magistrate judge acknowledged that the picture drawn by Dr. Wills was aggravating and "awfully simplistic."[40] Because of Ezell's deficient performance, Dr. Wills and the jury were unaware of the history of Walbey's relationship to the victim, which reduced Dr. Wills to an explanation that he now describes as "pretty dadgum lame."[41]

We are also convinced that, unlike the defense's psychiatric testimony in Williams, which, according to the Supreme Court's account of it, appeared neither to hurt nor help the case, Dr. Wills did severe damage to Walbey's case. He testified that Walbey could be diagnosed with anti-social personality disorder (an aggravating diagnosis), even though he did not believe that to be correct. Ezell did not seek on redirect to rehabilitate Dr. Wills; and, despite his awareness that the state would try to paint Walbey as a sociopathic monster, Ezell made no effort to prepare Dr. Wills for this line of questioning. Both Dr. Wills's explanation for the crime and his testimony that Walbey would do it again under the same circumstances were highly prejudicial, particularly coming from a defense witness. This likely explains why the TCCA cited his testimony as evidence of Walbey's future dangerousness.[42] Dr. Wills now admits to feeling embarrassment over how poorly prepared to testify he felt.[43] Considered

---

[40] Id. slip op. at 37.

[41] Id. slip op. at 27.

[42] Walbey v. State, 926 S.W.2d 307, 311 (Tex. Crim. App. 1996).

[43] Walbey V, No. 3:99-cv-00496, slip op. at 27.

together, it is undeniable that the mitigating evidence omitted by Ezell during Walbey's sentencing overwhelms the "scant" evidence, "bereft in scope and detail," that was presented.

Without more, Texas's next argument — that Walbey suffered no prejudice because the brutality of his crime eclipses any mitigating evidence — is a non-starter. In Gardner v. Johnson, we addressed this "brutality trumps" argument while discussing prejudice in the § 2254 context, albeit for a Fifth, rather than a Sixth Amendment claim.[44] We said:

> [T]he State's stereotypical fall-back argument — that the heinous and egregious nature of the crime would have ensured assessment of the death penalty even absent [the error] — cannot carry the day here. First, that argument cannot prevail without eviscerating the Supreme Court-approved Texas "special issues" scheme. To permit a jury to impose the death sentence solely because the facts are heinous and egregious would be to return to the days of inflicting capital punishment based on emotion and revenge, supplanting altogether the questions of deliberateness and future dangerousness which make the Texas scheme constitutional. Second, in this particular case, the details of the crime, as horrific as they are on an absolute scale, are not significantly more egregious than those in [a case compared to which Walbey's crime is not significantly more egregious] . . . . Finally, our decades of experience with scores of § 2254 habeas cases from the death row of Texas teach an obvious lesson that is frequently overlooked: Almost without exception, the cases we see in which conviction of a capital crime has produced a death sentence arise from extremely egregious, heinous, and shocking facts. But, if that were all that is required to offset prejudicial legal error and convert it to harmless error, habeas relief . . . would virtually never be available, so testing for it would amount to a hollow judicial act.[45]

Under Gardner, Texas must do more than baldly point out the obvious, that Walbey's crime was extremely brutal. Texas has not done more.

---

[44] 247 F.3d 551 (5th Cir. 2001).

[45] Id. at 563 (footnote omitted).

The final three arguments made by Texas essentially collapse into one. Texas notes that the record on which Walbey now relies contains unhelpful and aggravating information that weakens the defense case and opens the door to a stronger case for the death penalty. The stronger version of this reasoning, that any unhelpful information renders otherwise potentially mitigating evidence useless, is foreclosed by Williams.[46] The weaker version, that the aggravating features of some mitigating evidence could overwhelm any mitigating effect, is not controversial, but neither is it the case here. The cases under which Texas claims otherwise are clearly distinguishable.

In Ransom v. Johnson, we held that the mitigating potential of evidence of comparatively mild physical, emotional, and possibly sexual abuse at the hands of a defendant's mother and older siblings was outweighed by evidence that he "was involved in numerous burglaries and thefts . . . [and] several psychological evaluations of [the defendant] which concluded that he was no longer affected by his childhood sufferings, he had adjusted 'quite well,' and he was of normal intelligence."[47] In contrast, none of the psychological evaluations of Walbey, even the last one, concluded that he had overcome his childhood sufferings or had adjusted "quite well."

The other cases Texas cites are inapposite in the extreme. In Cockrum v. Johnson, the proffered mitigation evidence included testimony that the defendant had a "Jekyll and Hyde" personality, that he had tried to burn down a school after the mitigation witness attempted to help him, and that he shot and killed his father before the murder for which he was sentenced to death.[48]

---

[46] 529 U.S. 362, 396 (2000) (addressing double-edged evidence in the context of a performance inquiry, but subsequently finding the failure to introduce the mitigating evidence, which contained the doubled-edged evidence, prejudicial).

[47] 126 F.3d 716, 724 (5th Cir. 1997).

[48] 119 F.3d 297, 303-04 (5th Cir. 1997).

 Analogously, in Hernandez v. Johnson, the defendant had twice been convicted for "grisly murders," had shot three prison guards, and was chairman of two units of the infamous "Texas Syndicate," membership in which was limited to "cold-blooded killers."[49] Similarly, in West v. Johnson, the defendant had previously committed an "almost fatal vicious knifing and assault" of another and, in the crime for which he was sentenced to death, "forced his way into the room of the victim — a woman he barely knew — in the middle of the night, and admitted that he had gone there with intent to kill her."[50] In Woods v. Johnson, trial counsel did not introduce evidence of the defendant's drinking problem or present testimony from a psychiatrist whom the defense had retained.[51] Only the psychiatrist's testimony was potentially double-edged; the evidence of a drinking problem was simply considered not mitigating. And, that psychiatrist's testimony is nowhere close to that which Dr. Wills testified he would have offered. The defense psychiatrist in Woods informed defense counsel that "counsel would not want him . . . to testify" because he found the defendant "anti-social and mean."[52] Finally, in Callins v. Collins, we held that in the absence of evidence of drug use at the time of the crime, evidence of prior drug use was probably more aggravating than mitigating.[53] The drug and alcohol use from Walbey's file, at least as developed previously, was not voluntary, which removes any aggravating character from it, and, moreover, was but a portion of the potentially mitigating evidence.

---

[49] 108 F.3d 554, 563-64 (5th Cir. 1997).

[50] 92 F.3d 1385, 1410 (5th Cir. 1996).

[51] 75 F.3d 1017, 1035 (5th Cir. 1996).

[52] Id. at 1020.

[53] 998 F.2d 269, 278 (5th Cir. 1993).

In addition, much of the evidence of Walbey's petty crimes and burglaries came out during the state's presentation at his punishment-phase hearing. The state had thus already introduced the aggravating "edge" of some of the evidence it now contends is double-edged. At a minimum, the mitigating nature of that evidence, such as the fact that Walbey stole to survive, could have demonstrated why Texas's evidence of past criminal behavior was double-edged.

Finally, had Ezell not so deficiently investigated Walbey's background and not so deficiently prepared Dr. Wills, he could have offered a rebuttal to Texas's argument that Walbey is a sociopath. The changes to Walbey's diagnosis of a conduct disorder and the fact that Dr. Wills himself thought that a diagnosis of anti-social personality disorder was not appropriate in Walbey's case (a point he was never asked to make on redirect after the state had tripped him up on cross-examination) are pieces of evidence, like that of Walbey's childhood and his relationship to the victim, sufficient to create a reasonable probability that one juror would have voted for life in prison rather than death. It was unreasonable under Williams for the TCCA to conclude otherwise.

## III. CONCLUSION

Walbey has satisfied both the performance and the prejudice prongs of Strickland. He is, therefore, entitled to relief. We remand this case with instructions to the district court to grant Walbey a writ of habeas corpus, directing Texas either to grant him a new punishment hearing or impose an appropriate non-capital alternative sentence.

REVERSED and REMANDED with instructions.