# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 11, 2009

Charles R. Fulbruge III
Clerk

No. 08-70017

MICHAEL JAMES PERRY

Petitioner-Appellant

v.

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

Respondent-Appellee

Appeal from the United States District Court
for the Southern District of Texas, Houston
USDC No. 4:07-CV-01032

Before JONES, Chief Judge, and CLEMENT and SOUTHWICK, Circuit Judges

EDITH H. JONES, Chief Judge:[*]

Petitioner Michael James Perry was convicted and sentenced to death in
Texas state court for murdering Sandra Stotler while burglarizing her house in
a subdivision in Montgomery County, Texas. After he exhausted state remedies,
Perry sought a writ of habeas corpus under 28 U.S.C. § 2254. The district court
denied relief and refused to grant a certificate of appealability ("COA"). Perry

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

now requests a COA on three issues: (1) his counsel was ineffective during the sentencing proceedings; (2) the government withheld potentially exculpatory evidence; and (3) as applied, the jury's mitigation instruction unconstitutionally limited the evidence the jury could consider. Because no reasonable jurist could find the district court's resolution of these issues debatable or conclude that Perry's arguments deserve to proceed further, we deny the request for a COA on all issues.

## I. BACKGROUND

Perry's guilt is not at issue in this appeal. The jury convicted him of capital murder for brutally murdering Sandra Stotler in the course of burglarizing her house. According to Perry's confession, he and his friend Jason Burkett decided to steal two cars. They identified two cars, a Camaro and Isuzu Rodeo, that belonged to the parents of another friend, Adam Stotler. Perry and Burkett made a plan to spend the night at the Stotler house and steal a car in the middle of the night. On October 24, 2001, Perry and Burkett drove to the Stotler house with a 12-gauge shotgun in a blue Chevy truck belonging to Burkett's girlfriend, Kristin Willis. Sandra Stotler, Adam's mother, told Perry and Burkett that Adam would not be home until 9 pm. They returned to their truck and drove several blocks before deciding that it would be easier to steal the car when only one person was home.

When they arrived back at the house, Burkett knocked on the front door and asked to use the phone. Perry then went into the house through the back door in the garage with the shotgun and hid in the laundry room. Perry knocked on the back door. When Sandra Stotler went to the back door, Perry came out of the laundry room and shot her in her side. Sandra Stotler fell, then tried to get up, and Perry shot her again. At this point, Perry and Burkett wrapped her in bedsheets and blankets and loaded her into the back of the truck. As they

could not find the keys to the Camaro, both Perry and Burkett left in Willis's truck.

Burkett drove the car to nearby Crater Lake. At first, Burkett and Perry opened the tailgate and tried backing up to the lake, hoping that Sandra Stotler's body would slide out. When that did not work, they grabbed her body and rolled her into the water. They covered her body with the sheets, sticks, and brush. Burkett and Perry drove to pick up Willis from work and returned to the Stotler house. When Adam Stotler arrived back at his house with his friend Jeremy Richardson, Burkett and Perry convinced them that a friend had been shot in the woods and needed their help. Adam and Jeremy followed Willis's truck in Adam's Isuzu. When they arrived in the woods, Perry and Burkett led Adam and Jeremy into the woods. According to Perry, Burkett shot Jeremy and then Adam. Perry removed the car keys and wallet from Adam's pocket. Burkett and Perry returned to the truck. Willis asked what had happened, became upset, and left in her truck. Burkett and Perry stole the Camaro and Isuzu. Perry ended his confession by stating that they returned home, cleaned up, and went to a bar.

Two days later, Perry attempted to evade police who had tried to stop him for traffic violations. The high speed chase ended when Perry wrecked the Camaro and fled on foot. He was eventually apprehended with Adam Stotler's wallet. He was booked and released on bond as Adam Stotler. The next day, Sandra Stotler's body was found in Crater Lake. Several days later, while in the stolen Isuzu, Perry and Burkett ran into a deputy sheriff's vehicle while trying to escape arrest. The vehicle crashed into a nearby store. Burkett and Perry were arrested hiding in a neighboring apartment complex; the shotgun used to kill Sandra Stotler was also found there.

Forensic evidence found near Crater Lake, in the woods, and at the Stotler residence matched Perry's confession. Perry was tried for Sandra Stotler's

3

murder. During his trial, Perry took the stand in his defense and claimed that his confession had been untrue. Perry, however, had made several subsequent statements that implicated him in the murder.

At the sentencing phase, the defense presented extensive evidence about Perry's family history and upbringing. An adopted child, Perry had been diagnosed with Attention Deficit Disorder ("ADD") at 8 years old. He was later diagnosed with oppositional defiant disorder. A year after that, he was diagnosed with conduct disorder. Perry twice tested negative for bipolar disorder after being admitted to a mental hospital. He never qualified for special education classes in elementary school, had an IQ of 97, and was by all accounts an average student.

Perry often ran away from home. He stopped going to school in junior high. He stole his mother's jewelry and the family car. He broke into a neighbor's home and destroyed the moldings. Perry's parents filed charges and had him committed to a long-term facility for mental health care. He was sent to Boys Town in Nebraska, but after threatening his house parents, he was moved to a locked facility within the program. Perry's problems did not qualify him for any mental health care provided by the facility. When he was expelled from Boys Town, his parents moved him to a secured high school campus in Mexico called Casa by the Sea. After high school, Perry was essentially homeless and jobless. He had a brief stint in the Job Corps, laying tile, and at Wal-Mart. Perry also stole and sold prescription pills to support his indulgence in alcohol and pills.

The defense presented testimony from Perry's biological mother who testified that she used drugs and alcohol until a month or two before Perry was born. Despite this, Perry was full weight and healthy when born. Although no biological relatives had committed murder, Perry's mother testified to a family history of depression, alcoholism, drug use, and thievery. Dr. Gilda Kessner, a

clinical psychologist with a forensics background, interviewed Perry and testified that Perry's youthfulness was his greatest risk factor for recidivism. After serving time in prison, Dr. Kessner testified, the likelihood of Perry's becoming violent would drop to zero.

The jury found Perry guilty of capital murder. During the sentencing phase, the jury found that Perry posed a continuing threat to society and that there were not sufficient mitigating circumstances to warrant a life sentence. The trial court sentenced Perry to death. The Texas Court of Criminal Appeals affirmed, and the United States Supreme Court refused Perry's petition for a writ of certiorari. Perry then filed a writ of habeas corpus. The Texas Court of Criminal Appeals denied all nineteen grounds for relief. Perry filed a federal petition for a writ of habeas corpus. The district court granted the director's motion for summary judgment and *sua sponte* denied Perry a certificate of appealability. Perry subsequently filed this appeal.

## II. DISCUSSION

To obtain a COA under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which governs this case, Perry must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 1039 (2003). Thus, he "must demonstrate that reasonable jurists could find the district court's resolution of his constitutional claims debatable or that reasonable jurists could conclude that the issues presented are adequate to deserve encouragement to proceed further." *Martinez v. Dretke*, 404 F.3d 878, 884 (5th Cir. 2005) (citing *Miller-El*, 537 U.S. at 336, 123 S. Ct. at 1039). "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." *Miller-El*, 537 U.S. at 336, 123 S. Ct. at 1039. Rather, it only "requires an overview of the claims in the habeas petition and a general assessment of their merits." *Id.* Nevertheless, "[b]ecause the present case involves the death

penalty, any doubts as to whether a COA should issue must be resolved in [the defendant's] favor." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000).

In addition, a state habeas court's findings of facts and its credibility determinations are presumed correct but may be rebutted by clear and convincing evidence. *See Summers v. Dretke*, 431 F.3d 861, 871-72 (5th Cir. 2005) (citing 28 U.S.C. § 2254(e)(1)).

Against these background criteria, we address each of Perry's issues.

## A. Ineffective Assistance of Counsel

In his application for a COA, Perry asserts that his trial counsel failed adequately to investigate, develop and present mitigating evidence for use at sentencing. Under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), Perry must show that his trial counsel's performance was deficient and that the deficiency resulted in prejudice. We measure counsel's performance against an objective standard of "reasonableness under prevailing professional norms." *Id*. at 688, 2065. Analysis under this standard begins with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and we must make "every effort . . . to eliminate the distorting effects of hindsight." *Id*. at 689, 2065.

When assessing effectiveness at the sentencing stage, counsel's "investigations into mitigating evidence should comprise efforts to discover all reasonably available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 524, 123 S. Ct. 2527, 2537 (2003). In assessing the prejudice prong, this court will ask "whether the changes to the mitigation case would have a reasonable probability of causing a juror to change his or her mind about imposing the death penalty." *Blanton v. Quarterman*, 543 F.3d 230, 236 (5th Cir. 2008). In doing so, we "evaluate the totality of the available mitigation evidence -- both that adduced at trial, and the evidence adduced in the habeas proceeding -- in

reweighing it against the evidence in aggravation." *Williams v. Taylor*, 529 U.S. 362, 397-98, 120 S. Ct. 1495, 1515 (2000).

First, Perry argues that counsel was late in locating and unsealing Perry's adoption records. Trial counsel subpoenaed Perry's adoption records at the beginning of jury selection, found several biological and adoptive relatives to testify, and retained Dr. Kessner to put together a mitigation package for sentencing. While Perry does not dispute this, he claims earlier and further investigation would have turned up three generations of alcoholism, substance abuse, and depression and provided a more complete picture of Perry's inherited problems.

Second, Perry argues that he is bipolar and a more complete psychological evaluation would have revealed his mental illness. Although Perry's counsel attributed Perry's crime to impulsivity associated with mental illness, the jury did not hear any specific evidence that Perry might be bipolar. Dr. Kessner is a clinical psychologist who interviewed Perry for seven to eight hours and also interviewed his biological relatives. The doctor testified at sentencing that Perry had ADHD and had suffered sexual abuse as a child. Although Dr. Kessner did not suspect Perry of being bipolar and there was nothing in Perry's record to indicate that he might suffer from bipolar disorder,[1] Perry argues that effective trial counsel would have suspected organic brain damage or some mental impairment beyond what had already been discovered.

Finally, Perry argues that his counsel did not investigate and present sufficient evidence of his drug and alcohol abuse. Although counsel presented evidence of Perry's drug and alcohol problems, Perry argues that counsel did not present it as serious enough or as something Perry had no control over. Counsel did present evidence that Perry had starting drinking and smoking marijuana

---

[1] The first mention of possible bipolar disorder was not made until Perry was transferred to death row.

at a very young age, had progressed to more serious drugs, was involved in a lot of drugs and drinking, and had been selling prescription drugs at one point.

Perry argues that trial counsel's conduct is analogous to the ineffective assistance in *Rompilla v. Beard*, 545 U.S. 374, 125 S. Ct. 2456 (2005). In that case, post-trial investigation uncovered a picture of Rompilla's "childhood and mental health [that was] very different[] from anything defense counsel had seen or heard." *Id.* at 390, 2468. Despite the fact that the prosecution had provided defense counsel with the file that included such evidence, Rompilla's counsel did not present this evidence during sentencing and had failed to examine a public file of the defendant's previous convictions. Petitioner has also directed us to *Walbey v. Quarterman*, No. 08-70007, slip op. (5th Cir. Jan. 19, 2009), an unpublished and therefore non-precedential opinion of this court. As with Rompilla's counsel, Walbey's trial counsel did not discuss mitigation with the psychologist, interview Walbey's mother, or investigate Walbey's relationship to the victim. The psychologist in that case presented no testimony on the mitigation issue.

In this case, however, Perry is unable to point to the sort of unreasonable performance that existed in *Rompilla* or *Walbey*. Perry's counsel did extensive investigation into Perry's biological family, provided the jury with testimony regarding Perry's troubled background, and offered Dr. Kessner's evaluation and mitigation testimony. Trial counsel was not required to shop for an expert who would diagnose Perry with a disorder for which he had already tested negative or present even more evidence of Perry's genetic past. "While in hindsight, it is easy to say that trial counsel could have done more, we find the state habeas court reasonable in its conclusion that trial counsel performed reasonably based on the context and circumstances at the time of the representation." *Blanton v. Quarterman*, 543 F.3d 230, 239 (5th Cir. 2008).

Because Perry fails to raise an issue concerning counsel's mitigation strategy that is debatable among reasonable jurists, we need not consider the *Strickland* prejudice prong and deny COA on this issue.

## B. *Brady* Violation

Perry argues that the prosecution violated his right to due process when it concealed potentially exculpatory evidence. Specifically, he believes that the State willfully or inadvertently withheld evidence that would have impeached key witnesses, Victor Neal and Kristin Willis, and that this prejudiced him.

Under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), the suppression by the prosecution of "evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 1196-97. In order to prevail on a *Brady* claim, Perry must show that "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–282, 119 S. Ct. 1936, 1948 (1999). This court has held that "evidence is not 'suppressed' if the defendant either knew, or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." *Rector v. Johnson*, 120 F.3d 551, 560 (5th Cir. 1997).

Victor Neal was Perry's roommate at the time of the murder. He testified both at the guilt and sentencing stage of the proceedings. Neal provided testimony that Sandra Stotler's murder was premeditated, that Perry and Burkett drove around town with a loaded shotgun looking for a place to dump the body, and that Perry was a serial criminal. At the sentencing stage, Neal testified that he was present when Perry and Burkett broke into a house and stole several electronics but that he waited in the car. Perry now argues that the

prosecution agreed not to prosecute Neal for his role as a lookout in the burglary and that they failed to turn over this information to the defense.

The State admits that Neal was nervous about his role in the burglary, but it asserts that prosecutors only assured Neal that they were not interested in him and that in exchange for his cooperation they did not discuss immunity or any other promises not to prosecute Neal in exchange for his testimony. One of the prosecutors explained to Neal that, based on what Neal had described, he could not be prosecuted because he was not actually a participant in the crime.

The State is required to disclose any inducements made to a witness—not just formal immunity agreements or promises. "Where, as here, the witness's credibility 'was . . . an important issue in the case . . . evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it.'" *Tassin v. Cain*, 517 F.3d 770, 778 (5th Cir. 2008) (quoting *Giglio v. United States*, 405 U.S. 150, 154-55, 92 S. Ct. 763 (1972) (omissions in original)).

The state habeas court issued extensive and detailed factual findings, including that the "State did not suppress evidence of an 'immunity agreement' with Victor Neal," "the evidence was insufficient to prove that Mr. Neal was more than merely present during the burglary," and, even without Neal's testimony, "the evidence of [Perry's] guilt is overwhelming." Perry does not present clear and convincing evidence to contradict these findings. It is untenable to argue that prosecutors have achieved testimony for their side from an innocent witness by offering to do that which they are required to do, *i.e.* not prosecute. We, therefore, agree with the district court that no reasonable jurist could conclude that the prosecutors violated their obligations under *Brady* in the way that they presented Neal's testimony.

Perry also contends that the prosecution suppressed a blood spatter on Kristin Willis's shirt, which would have impeached her testimony that she was

not present during the murders. According to an affidavit from the State, the prosecution had an open file policy. Willis's shirt, her statement admitting that the shirt was hers, and blood tests revealing blood matter and the possibility of a high velocity blood spatter were all included in the case file. Trial counsel admitted that he recalled seeing photos of the shirt, and another trial counsel remembered seeing DNA reports on it.

Perry acknowledges that his trial counsel were aware of the shirt and a DNA report that did not link the blood on the shirt to Perry or Sandra Stotler, but he argues that the blood spatter itself was not disclosed. Because the State maintained an open file policy and trial counsel had access to the necessary information, the prosecution had no duty to give further guidance as to what evidence may have been exculpatory. *See United States v. Mulderig*, 120 F.3d 534, 541 (5th Cir. 1997). In addition, there was unrefuted evidence that Kristin Willis was at work during the time that Sandra Stotler was killed. This evidence included phone and work records and the testimony of a coworker.

In the alternative, Perry asserts in passing that if his trial counsel did have access to the blood spatter, trial counsel was ineffective for failing to use the shirt to impeach Willis. Perry, however, did not brief this issue to the district court and presents no reason why her impeachment could have overcome the overwhelming evidence tying him to Sandra Stotler's murder.

Our review of the record persuades us that reasonable jurists could not debate the district court's conclusion that no relief is warranted by the *Brady* claims.

### C. Unconstitutional Mitigation Instruction

Perry argues that, as applied, the Texas mitigation instruction unconstitutionally limited the mitigating evidence that Perry's jury considered. Because Perry did not raise this as-applied challenge before the state courts or

the district court, his claim has not been exhausted and is procedurally defaulted.

"A federal habeas petition should be dismissed if state remedies have not been exhausted as to all of the federal court claims. . . . The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court." *Smith v. Dretke*, 422 F.3d 269, 275 (5th Cir. 2005) (citing *Picard v. Connor*, 404 U.S. 270, 275-78, 92 S. Ct. 509 (1971)). "The exhaustion requirement is not satisfied if the prisoner presents new legal theories or factual claims in his federal habeas petition." *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997) (citing *Anderson v. Harless*, 459 U.S. 4, 6-7, 103 S. Ct. 276 (1982)).

In his brief to the district court, Perry brought a facial challenge to Texas's mitigation instruction. Examples from his trial were given to demonstrate the facial invalidity of the instruction. Perry now argues that this also constituted an as-applied challenge. Nothing in his brief, however, gave any indication that Perry was challenging Texas's mitigation instruction as it was applied in his case. Rather, Perry argued that "viewed in practice, [the Texas scheme] unconstitutionally denies capital defendants the right to have all their relevant mitigating evidence considered by the jury."

The district court made no ruling on the effect of the mitigation instruction in this trial because Perry had not argued it. We reject Perry's suggestion that the district court had an independent obligation to look beyond the issue and instruction for "reason to believe that the jury was confused or misled in answering the mitigation special issue." *Scheanette v. Quarterman*, 482 F.3d 815, 826 (5th Cir. 2007). In *Scheanette*, the district court considered the as-applied challenge to the instruction because it had been raised by Scheanette, not because of an independent obligation to do so. *Id.* ("Scheanette's claim that the instruction in effect 'nullified' the mitigation special issue is unsupported.").

Requiring district courts to search through the record to determine whether as-applied *Penry* challenges are appropriate would be a gross distortion of AEDPA, which places the burden on the petitioner to prove that the state courts have unreasonably applied governing constitutional law. *See Penry v. Lynaugh*, 492 U.S. 302, 109 S. Ct. 2934 (1989) (holding that jury instructions must provide the jury with a vehicle for expressing its reasoned moral response to mitigating evidence in rendering its sentencing decision).

At the state level, Perry briefly made a facial challenge to the mitigation instruction in his direct appeal to the Texas Court of Criminal Appeals. In his reply brief to this court, Perry does not contest that he did not argue an as-applied challenge to the state court. Instead, Perry argues that the State waived this argument. 28 U.S.C. §2254 states that a state can only waive the exhaustion requirement through express waiver. In its answer to Perry's federal habeas petition, the State acknowledged that "Perry exhausted his claims regarding the constitutionality of the Texas mitigation special issue during direct appeal." This is not an express waiver as to the as-applied challenge. While the State conceded that Perry had exhausted the claims he had presented below, the State did not and could not have waived this argument as to the new claims he now argues.

Because Perry did not exhaust this argument at the state level or brief this issue to the district court, we will not consider it.

## III. CONCLUSION

For the reasons discussed above, we deny Perry's request for a COA on all claims and as such lack jurisdiction to review the district court's denial of habeas relief on these claims. *See Miller-El*, 537 U.S. at 335-36, 123 S.Ct. at 1039.

**COA DENIED.**

13